In re WESTERN DISTRICT
XEROX LITIGATION.

This document applies to all cases.

Master File No. 91–MC–138L.

United States District Court,
W.D. New York.

April 26, 1994.

Donna Marianetti, Rochester, NY, for
plaintiffs.

Eugene D. Ulterino, Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

Between June 1989 to April 1990, twenty-three former employees[1] of Xerox Corporation ("Xerox") filed twenty-three separate actions, in the Western District of New York, alleging that they were each terminated or forced to retire from Xerox during 1981–82, on account of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.

The alleged discriminatory acts occurred during 1981–82 when Xerox reduced its work force by 18,000 employees.

All of the plaintiffs, in their separate complaints, have alleged that Xerox took the adverse job actions as part of a "pattern and practice" of age discrimination.

A Case Management Order was entered August 15, 1991, which created a Master Docket for the twenty-four cases filed against Xerox at that time. This order simply provided procedures for filing documents and orders relating to all of the cases with the direction that orders and documents affecting all of the cases be filed and docketed with the caption "In Re: Western District Xerox Litigation, 91–MC–138L." By dint of that order, the cases were treated as consolidated for purposes of case management and discovery, in part because plaintiffs were all represented by the same law firm, and to properly manage discovery. That order did not purport to consolidate the cases for any other purpose or for trial.

Xerox has moved for summary judgment in each of the cases and, in the alternative, for in limine rulings with respect to certain issues. Some grounds for summary judgment raised by Xerox affect all of the plaintiffs as a group; others relate only to individual plaintiffs.

This decision will deal with some but not all of the issues raised in Xerox's summary judgment motions. This decision will deal with the following issues:

1. Whether Xerox is entitled to summary judgment on plaintiffs' claim that Xerox engaged in a pattern and practice of age discrimination affecting all the plaintiffs; and

2. Whether plaintiffs' actions should be deemed commenced within two years after the alleged discriminatory acts or within three years, the latter date requiring proof of willfulness under 29 U.S.C. § 626(e)(1).

### Procedural History: Lusardi Action

Plaintiffs' claims have a lengthy, complex procedural history involving several federal courts. This background is of more than mere historical interest; it directly affects some of the issues between the parties on this summary judgment motion.

In 1983, Jules Lusardi and a group of former Xerox employees, commenced a class action (hereinafter "Lusardi action") in the District Court of New Jersey alleging, in part, that they and others similarly situated, were terminated as a result of "age based corporate policies and practices ... designed ... to terminate or force into retirement a high percentage of persons 40 or over ..." Lusardi v. Xerox, 118 F.R.D. 351, 353 n. 4 (D.N.J.1987).

In 1984, the case was conditionally certified as an "opt in" class action under the ADEA. All of the twenty-three named plaintiffs in this action in the Western District of New York, together with about 1300 others, opted in to the class.

For about two years, from 1984 through 1986, the parties engaged in extensive discovery in the Lusardi action, pursuant to a discovery plan. According to that discovery plan, discovery was conducted relative to the thirteen named plaintiffs in the Lusardi action and fifty-one randomly selected class members which purported to represent a "microcosm" of the entire class. Lusardi, 118 F.R.D. at 354.

---

[1]. Originally there was an additional, twenty-fourth, plaintiff, Alfonse F. Oliveri, as part of the group. On December 4, 1992, this Court granted Xerox's summary judgment motion and dismissed Oliveri's complaint as time-barred (89–CV–1053L). The Second Circuit affirmed that judgment on January 14, 1994.

During this discovery, Xerox produced and counsel for the plaintiffs examined approximately 100,000 pages of documents; 29 days of depositions were taken of nine Xerox executives and key members of its personnel departments; 25 days of depositions were taken of 10 of the 13 named plaintiffs; and a total of nearly 100 interrogatories were answered.

*Id.,* 118 F.R.D. at 354.

After these extensive discovery proceedings, on November 5, 1987, the district court (Lechner, J.) decertified the class in a lengthy opinion (118 F.R.D. 351). Judge Lechner determined, among other things, that the class representatives and other members of the class were not similarly situated and, for the many reasons that he discussed in his decision, Judge Lechner decertified the class. In so ruling, Judge Lechner noted:

The described downsizing of the Xerox work force was implemented and managed at the local level. The local management assessed its particular work force needs, consistent with corporate policy. Accordingly, a reduction differed not only from organization to organization but also from manager to manager, as well as from RIF to RIF. It appears there was never a corporate-wide VRIF or IRIF. However, "there were at least 40 separate IRIF's and more than 25 separate VRIF's during the class period conducted at various times by particular Xerox organizations."

*Id.,* 118 F.R.D. at 356.[2]

On remand from a mandamus petition to the Third Circuit, *Lusardi v. Lechner,* 855 F.2d 1062 (3d Cir.1988), Judge Lechner, on reconsideration, stated that he "was satisfied this case cannot continue in a class action status." *Lusardi v. Xerox Corp.,* 122 F.R.D. 463, 465 (D.N.J.1988).

Judge Lechner stated the following:

[T]he opt-in plaintiffs present what amounts to a series of more than thirteen hundred individual cases. The members of the proposed class come from different departments, groups, organizations, sub-organizations, units and local offices within the Xerox organization. The opt-in plaintiffs perform different jobs at different geographic locations and were subject to different job actions concerning reductions in work force which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis. This case should not continue in a class status.

*Id.,* 122 F.R.D. at 465.

A final order was entered on November 10, 1988, decertifying the action as a class action.

After the decertification of the class action, each of the twenty-three plaintiffs, from June 1989 to April 1990, commenced an individual action in the Western District of New York against Xerox alleging that they were each terminated or forced to retire on account of a corporate-wide pattern and practice of age discrimination at Xerox.

## I. Pattern Or Practice of Discrimination

Plaintiffs propose that all of these cases be consolidated for a single trial on the issue of whether Xerox engaged in a pattern or practice of age discrimination when Xerox reduced its workforce by 18,000 employees in 1981–82. If liability is found at that stage, plaintiffs suggest that separate trials then be held to determine damages.

This approach generally follows that described in *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The *Teamsters* model differs from the typical disparate treatment claim in that, at the *prima facie* stage, plaintiffs need not offer evidence that each of them was discriminated against. Rather, plaintiffs must show that discrimination of the type alleged was the defendant's "standard operating procedure . . ." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). Such a showing, if made, creates "a presumption that the individual class members ha[ve] been discriminated against . . ." *Id.* at 875, 104 S.Ct. at 2799. The case then moves on to a second, "remedial" stage at which defendant

2. "RIF" refers in general to Xerox's reduction in force programs. These programs included voluntary employee terminations (VRIF) and involuntary employee terminations (IRIF).

bears the burden of demonstrating that the individual plaintiffs were not victims of the discriminatory practice. *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868. The *Teamsters* approach thus differs from the traditional *McDonnell Douglas*[3] analysis in that the burden of persuasion can shift from plaintiffs to defendant.

For the reasons that follow, Xerox's motion for summary judgment is granted on the claim that Xerox engaged in a pattern and practice of discrimination. There is an insufficient legal and factual basis to submit this theory of liability to the jury.

### Law of the Case: Lusardi Action

First of all, a strong argument can be made that this issue has already been decided between these parties in the prior class action proceedings in *Lusardi.*

All twenty-three plaintiffs were members of the *Lusardi* class action and, therefore, they are all bound by the judgment and all orders entered in that case. *Cooper,* 467 U.S. at 880, 104 S.Ct. at 1801–02; *Sperling v. Hoffmann–LaRoche,* 145 F.R.D. 357, 364 (D.N.J.1992); *see also* Fed.R.Civ.P. 23(c)(2)((a).

" 'As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)).

It is clear from Judge Lechner's two decisions in *Lusardi,* (118 F.R.D. 351 and 122 F.R.D. 463) that he believed and found that the representative plaintiffs in the class action had failed to establish any corporate-wide policy or practice of age discrimination.

In his initial decision decertifying the class, he held that plaintiffs were not similarly situated in part because "plaintiffs, after extensive discovery, [had] not uncovered any policy or practice of age discrimination at Xerox." *Lusardi,* 118 F.R.D. at 359. Judge

Lechner discussed, at length, the many reasons why the plaintiffs, and others, were not similarly situated, requiring decertification of the class. *See Lusardi,* 122 F.R.D. at 466.

Judge Lechner found that there was not even a basis for the creation of subclasses because "[t]here is not commonality among the people who were subject to more than 60–five separate reductions in force, virtually all of which occurred at separate points in time. In the absence of one corporate-wide reduction in force, about all that the members of the proposed class have in common is their termination and age within the protected range." *Lusardi,* 122 F.R.D. at 466.

Judge Lechner discussed the *Teamsters* case at length and found its analysis to be inappropriate and determined that the case would not proceed as a class action under principles established in that case.

The clear import of Judge Lechner's two decisions is that if the plaintiffs *had* established a corporate-wide pattern and practice of discrimination, then there might have been a sufficient basis to allow the case to proceed as a class action.

■ In essence, this is the third time that plaintiffs have attempted to convince a federal court that there are sufficient facts and circumstances to establish a corporate-wide pattern and practice of discrimination. Judge Lechner dealt with the issue in both of his two decisions. Although it is true that the holding of Judge Lechner's decisions dealt with the decertification of the class, the underlying factual basis for that holding was, in part, that plaintiffs had failed to establish, after extensive discovery, the existence of any corporate-wide pattern and practice of age discrimination. Of necessity, it appears that Judge Lechner decided that there was no corporate-wide pattern of discrimination. The law-of-the-case doctrine applies to issues that have been decided expressly or by necessary implication. *Fogel v. Chestnutt,* 668 F.2d 100, 108 (2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); *Doe v. New York City Dep't of Social Services,* 709 F.2d 782, 788 (2d Cir.), *cert. denied,*

---

3. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Cohen v. Federal Ins. Admin.*, 654 F.Supp. 824, 825 (E.D.N.Y.1986). To allow a trial in the Western District of New York on this pattern and practice issue, would in effect allow plaintiffs to circumvent Judge Lechner's prior findings as to pattern and practice.

I need not base my decision, however, on this law-of-the-case analysis. For one thing, Xerox does not press this point and, in any event, on the merits, it is clear that the case should not proceed on a pattern and practice theory. Plaintiffs have not demonstrated here that there is any greater basis to follow the *Teamsters* model now than there was when Judge Lechner issued his decisions several years ago. In other words, aside from the strong evidence that this issue has already been decided between these parties, in order to put it to rest and achieve closure, Xerox is entitled to summary judgment on the claims brought in the Western District of New York insofar as they seek to establish a pattern and practice of age discrimination.

### Class Action Versus Individual Action

It is also questionable whether it would be appropriate in this litigation to try the pattern and practice issue separately, regardless of the strength of plaintiffs' evidence. Trials of that discrete issue generally occur in the context of class actions or suits brought by the Government which follow the *Teamsters* paradigm. Of course, this case is no longer a class action and the Government is obviously not involved in the litigation. As discussed above, the case was specifically decertified, in part, because plaintiffs had failed to uncover any policy or practice of corporate-wide age discrimination.

What is before the court at this stage, then, is twenty-three separate actions. Although a "master" file has been created for the sake of efficient discovery and management, they remain individual cases, and have not been consolidated for trial or any other

purpose. Plaintiffs have submitted no authority that it would be appropriate in this situation to hold a *Teamsters*-type liability trial and, if a pattern or practice is found at that stage, to shift the burden to defendant to show that the individual plaintiffs were not victims of discrimination.

■ The case authority in this area suggests that it is not proper when dealing with individual claims to hold a joint trial on the pattern-or-practice issue, especially when there has already been a finding that there is no evidence of a pattern or practice of discrimination. *See, e.g., Cooper*, 467 U.S. 867, 104 S.Ct. 2794 (district court's judgment after trial finding no classwide discrimination precluded class members in any other litigation with defendant from relitigating whether defendant had engaged in pattern or practice of discrimination during relevant time period; individual plaintiffs could still pursue *McDonnell Douglas*-type claims); *King v. General Elec. Co.*, 960 F.2d 617, 622 (7th Cir.1992) ("[t]he [Supreme] Court has noted the 'manifest' difference between individual claims of discrimination and a class action alleging a general pattern or practice"; trial court may have abused discretion in trying individual and class claims together) (citing *Cooper*, 467 U.S. at 876, 104 S.Ct. at 2799);[4] *Gilty v. Village of Oak Park*, 919 F.2d 1247 (7th Cir.1990) (since plaintiff had individual claim only, evidence of pattern and practice was collateral to his claim and could not give him presumption of discrimination); *Hervey v. City of Little Rock*, 787 F.2d 1223, 1231 (8th Cir.1986) (since district "court properly decertified the class, none of the [plaintiffs] was entitled to the presumption of discrimination in his individual case"); *Babrocky v. Jewel Food Co. & Retail Mfrs.*, 773 F.2d 857, 866–67 n. 6 (7th Cir.1985) ("Plaintiffs' use of 'pattern-or-practice' language also seems to be misplaced, since such 'suits, by their very nature, involve claims of classwide discrimination,' and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated

---

4. *Council 31, AFSCME v. Ward*, 978 F.2d 373, 378 (7th Cir.1992), cites *King* for the proposition that "individual plaintiffs may bring a 'pattern or practice' action." That statement is dictum, however, as *Ward* itself was a class action, and

the reference to *King* was in the context of the court's explanation that an "employment practice" in a disparate impact case is not the same as a pattern or practice in a disparate treatment case.

only their individual claims, not a class action") (quoting B. Schlei & P. Grossman, Employment Discrimination Law 1322 n. 95 (2d ed. 1983)); *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864 (9th Cir.1982) (upon finding that plaintiffs had failed to adduce sufficient evidence of classwide discrimination to support class action, district court properly analyzed individual plaintiffs' claims under *McDonnell Douglas* rather than *Teamsters* ).[5]

### Plaintiffs' Failure To Demonstrate a Genuine Issue of Material Fact Relating to a Pattern and Practice of Age Discrimination

■ Even if a *Teamsters* analysis could ever be appropriate for individual cases, the evidence proffered by plaintiffs in these cases is insufficient to present that issue to a jury. The evidence adduced in opposition to Xerox's motion does not present a genuine issue concerning whether defendants have engaged in a pattern or practice of discrimination.

One of the most glaring flaws in these cases is plaintiffs' reliance on purely anecdotal evidence. They have no statistical evidence of their own, and they do not have an expert who is prepared to opine that defendants' statistics give rise to an inference of discrimination. Only defendants have come forward with statistical evidence, and as the record now stands, that evidence tends to rebut plaintiffs' allegations of discrimination. As analyzed by defendant's expert, the data for the IRIFs which affected the plaintiffs in these cases show no statistically significant disparities based on age. In fact, in many instances the under–40 age group was *more* adversely affected than the over–40 group. Affidavit of David E. Bloom, sworn to No-

vember 19, 1993, Ex. A. For example, defendant's expert found that from 1981 to 1983, the proportion of employees aged 40 and older did not decrease in any of the organizations in which the fourteen "IRIFed" plaintiffs worked. Bloom Aff. ¶ 6. Comparing the IRIF rates for workers under 40 and workers 40 and over, he found that none of the 24 estimated differentials was statistically significant. Furthermore, 14 of the differentials were negative, *i.e.,* they indicated that the older employees had a *lower* IRIF rate than the younger ones. *Id.* ¶¶ 15, 17, 19. *See Cronin v. ITT Corp.,* 737 F.Supp. 224, 228 (S.D.N.Y.1990) (no evidence of age discrimination where average age of workforce increased after layoffs).

In general, "a pattern or practice of disparate treatment is shown through a combination of 'statistical evidence demonstrating substantial disparities * * * buttressed by evidence of general policies or specific instances of discrimination.'" *E.E.O.C. v. Chicago Miniature Lamp Works,* 947 F.2d 292, 299 (7th Cir.1991) (quoting *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985)). That is not to say that the absence of statistical evidence must invariably prove fatal in every pattern-and-practice case. Where the overall number of employees is small, anecdotal evidence may suffice. *See, e.g., Pitre v. Western Elec. Co.,* 843 F.2d 1262, 1268 (10th Cir.1988) (sample sizes ranging from two to twenty-four people were too small to produce meaningful use of statistics, but plaintiff presented ample other evidence of discrimination to show pattern and practice); *accord Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984).

That is hardly the case, here, however. Plaintiffs have alleged a pattern or practice

5. The Eleventh Circuit held in *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986), that a district court erred when, after decertifying a class of eighteen plaintiffs, it followed the *McDonnell–Douglas* model in trying the individual claims. The court stated that once the trial court found that the defendant had a policy of reserving certain jobs for men, "these individuals were in substantially the same position as the *Teamsters* and *Franks* [*v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)] plaintiffs—that is, they

had proven that sex discrimination 'was the company's standard operating procedure,' and they were entitled to the presumption that the complained-of employment practices violated Title VII." *Id.*

Significantly, however, the court in *Cox* went on to find that the district court had erred in decertifying the class in the first place, and the court remanded with directions to recertify and try the case as a class action. Thus, *Cox* does not stand for the proposition that individual plaintiffs in a non-class action are entitled to enjoy the benefit of *Teamsters'* burden-shifting model.

of discrimination in an international corporation which employs thousands of employees. The RIF's during which plaintiffs were terminated or otherwise left their employment involved some 18,000 people. Under circumstances such as these, statistics are especially crucial to a pattern-and-practice case, because even many instances of individual acts of discrimination will involve only a small fraction of the relevant workforce. Even if all twenty-three of the plaintiffs showed some discrimination as to them individually, in light of the massive numbers of employees who were terminated or took retirement, as a matter of law, plaintiffs could not demonstrate a pattern and practice with that *de minimis* evidence.

Regardless of the type of evidence used, the burden of establishing a pattern or practice of discrimination is not an easy one to carry. "[T]o make out a pattern or practice case, a plaintiff must show systematic disparate treatment—that is, that intentional ... discrimination is the standard operating procedure of the defendant, not merely that there have been isolated, sporadic acts of disparate treatment." *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991).

To make this showing, therefore, courts in pattern-or-practice cases have "required substantial proof of the practice." *King*, 960 F.2d at 624. That proof typically includes both statistical and anecdotal evidence. *Chicago Miniature Lamp Works*, 947 F.2d at 299. When one type of evidence is missing altogether, the other must be correspondingly stronger for plaintiffs to meet their burden. In a case involving as large a labor force as this one, however, it would be nearly impossible for plaintiffs to establish solely by means of anecdotal evidence from a relative handful of employees a pattern of age discrimination emanating from the upper echelons of corporate management. Thus, plaintiffs have themselves magnified their own burden by not using statistics to back up their claims and "by choosing other and perhaps more difficult methods of proving classwide discrimination." *Briggs v. Anderson*, 796 F.2d 1009, 1019 (8th Cir.1986). *See also Coates*, 756 F.2d at 545 (plaintiffs' "lack of statistical proof greatly weakened their case").[6]

In this type of case, where there are massive reductions in force, absent some established corporate policy or admissions of corporate executives, statistical evidence would seem to be the *sine qua non* for this type of action. In fact, a number of courts have said explicitly that statistics are required in a pattern-and-practice case. The Fifth Circuit, for example, stated in a case involving alleged race discrimination in hiring that "[c]lass action or pattern and practice employment discrimination suits require a statistical comparison between the racial composition of the employer's work force and that of the relevant labor market before a finding of discrimination can be made." *Castaneda by Castaneda v. Pickard*, 781 F.2d 456, 463 (5th Cir.1986).

The Ninth Circuit also expressed doubt about the ability of anecdotal evidence to prove a widespread practice of discrimination in *Coral Constr. Co. v. King County*, 941 F.2d 910 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992). The court observed there that "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can

---

6. At argument on this summary judgment motion, one of plaintiffs' lawyers inferred that plaintiffs had been thwarted in obtaining discovery relative to statistical information. The facts and the record do not support this claim. The record demonstrates that there was extensive discovery in this case. First of all, there had already been two years of discovery in the *Lusardi* action. *See Lusardi*, 118 F.R.D. at 354. In addition, from the date the cases in the Western District of New York were consolidated for management purposes on August 15, 1991, the parties engaged in discovery until Magistrate Judge Kenneth R.

Fisher's last amended scheduling order was entered March 22, 1993, a period of approximately nineteen months. Magistrate Judge Fisher issued a decision on March 22, 1993 denying further extensions of discovery in view of the fact that discovery had been closed for some time, and I affirmed that decision on May 27, 1993.

By any analysis, there has been lengthy, extensive discovery, and it is clear that plaintiffs had more than ample time, consistent with the Court's scheduling orders, to obtain whatever information they needed to prosecute these cases.

such evidence show a systemic pattern of discrimination ..." *Id.* at 919.

Regardless of whether statistical evidence is absolutely necessary, however, it is clear that isolated incidents of individual discrimination cannot by themselves establish a pattern or practice. For example, in *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395 (2d Cir.1981), the court held that seven cases of alleged discrimination could not establish a pattern or practice of discrimination in a company with 505 employees in the absence of relevant statistics. The court stated that:

> While evidence of subjective and discretionary promotion and transfer procedures may indeed strengthen the inference of a pattern or practice of purposeful discrimination that can be drawn from a valid statistical showing of disparities in the work force, this is because the statistical disparities in such a case are evidence that the potential for disparate treatment created by loose procedures has been realized on a significant scale. But when, as here, relevant statistics are lacking and the probative evidence of discrimination is confined ... to seven individual incidents, subjective decisionmaking methods are not sufficient to establish a pattern or practice of discrimination; all that could be inferred is that their potential has been actualized in the same seven cases.

*Id.* at 405.

Similarly, the Seventh Circuit in *King,* 960 F.2d 617, held that a group of plaintiffs, who had brought separate actions but were represented by one attorney, did not present sufficient evidence for the jury to find a pattern of practice of discrimination when the plaintiffs were terminated, largely because "[t]here was no statistical evidence supporting this claim." *Id.* at 626. The court stated that "[a]lthough statistical evidence is not strictly required," the plaintiffs had also "failed to provide the amount of anecdotal evidence claimants in other cases have supplied to support a finding of a pattern or practice of discrimination." *Id.* at 627. Plaintiffs acknowledge that they have no statistical evidence to support the pattern and practice claim, but they believe that in spite of that deficiency they have other evidence to defeat the summary judgment motion. But in my view, plaintiffs' arguments that they have raised genuine issues of fact concerning the pattern-or-practice issue are not persuasive.

First, the mere fact that this litigation is complex, or that an issue of intent is involved, cannot save plaintiffs' pattern-and-practice claim if there is clearly insufficient evidence to support it. General maxims concerning the inappropriateness of summary judgment in certain situations do not absolve plaintiffs of their burden of coming forward with specific facts to show the existence of a genuine issue of material fact. "The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) (affirming summary judgment in defendants' favor in Title VII action), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Plaintiffs argue that the instant cases are distinguishable from *Meiri* in that plaintiffs have come forth with concrete particulars of discrimination. Even assuming the truth of all plaintiffs' allegations concerning particular instances of discrimination, however, the fact remains that they amount to nothing more than individual incidents that cannot, without more, give rise to an inference that defendant engaged in a corporate-wide pattern or practice of discrimination.

Plaintiffs' contention that summary judgment should not be granted on the pattern-and-practice issue before they have had an opportunity to cross-examine the defense expert's analysis of the statistical data begs the question. Whether plaintiffs should have the opportunity to challenge defendant's proof at trial depends on whether plaintiffs themselves have adduced sufficient evidence at this stage to survive the summary judgment motion and proceed to trial. On this aspect of the litigation, I do not believe that they have done so.

Plaintiffs' arguments concerning the use of anecdotal evidence also miss the mark. Plaintiffs cite a number of cases in support of the proposition that anecdotal evidence is

admissible and probative to show a pattern or practice of discrimination. The issue is not whether such evidence is admissible; in fact, statistical evidence unsupported by anecdotal evidence has many of the same flaws as bare anecdotal evidence. *Coral Constr. Co.*, 941 F.2d at 919. The question is whether anecdotal evidence, in this case against Xerox, standing alone, could lead a reasonable jury to conclude that Xerox maintained a pattern or practice of discrimination. On the record before me, I conclude that the evidence here could not.

The lack of statistical evidence is the most glaring deficiency in plaintiffs' proof. The anecdotal evidence concerning the individual plaintiffs or others is also insufficient to create a factual issue as to whether Xerox engaged in a pattern and practice of discrimination. In addition, other evidence, which is mostly documentary evidence from Xerox, does not create a factual issue concerning whether Xerox engaged in a pattern and practice of age discrimination. The evidence which purports to show a discriminatory intent behind the RIFs "is 'so attenuated and weak' as to be at best merely colorable and not significantly probative." *Earley v.*

*Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990) (quoting *Ard v. Southwest Forest Indus.*, 849 F.2d 517, 521 (11th Cir. 1988)).

When the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

"It is the responsibility of the party opposing the motion for summary judgment to set forth specific facts demonstrating that there is a genuine issue for trial. The nonmovant who bears the burden of proof on an issue may not merely stand on his pleadings, but must allege specific facts which demonstrate that a genuine material issue of triable facts exists." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232 (7th Cir.1991) (citations omitted).

Plaintiffs have submitted a number of documents which they contend support an inference of discriminatory intent. Neither singly nor collectively do they do so.[7]

"[T]here is no duty imposed upon the trial court to 'search' the entire record to establish that it is bereft of a genuine issue of material fact.'" *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). The nonmovant's "burden might 'not require the nonmoving party to "designate" facts by citing specific page numbers,' ... [but] 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies.' This burden is really an opportunity to assist the court in understanding the facts." *Id.* at 405 (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)). "Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record." To hold otherwise would mean "that the district court would be required to excavate all of the presented record, and find for itself any nuggets of evidence that might demonstrate genuine issues of material fact." *Id.* at 405. "What concept of judicial economy is served when judges ... are required to do the work of a party's attorney? ... [T]he Rule requires the non-moving party to do its own work, and to assist the trial court by responding to the motion, pointing out as specifically as is reasonably possible facts that might demonstrate

---

7. In addition to the documents actually submitted to the court and discussed by plaintiffs, plaintiffs have submitted a list of documents and deposition excerpts which plaintiffs contend support their claims of age discrimination. *See* Affidavit of Donna Marianetti sworn to Jan. 21, 1994, ¶ 20 and Ex. 1. The list identifies what the documents are and who authored them, but neither the list nor counsel's affidavit explains how any of these items support plaintiffs' claims. Nor does the list describe, even in summary fashion, the content or substance of the document. Plaintiffs' counsel states that "[b]ecause producing all of these documents may be unduly burdensome for the court, the plaintiffs incorporate the documents by reference" and that "if the court wishes to be provided copies of the documents, they will be furnished upon request." *Id.* ¶ 20.

Such a list which is not defined or described is of no help and cannot be considered by the Court. Plaintiffs' counsel merely asserts that these documents support their claim but fails completely to indicate how that is so. Obviously, the Court cannot simply take counsel's assertion and leave it at that. It is not for this Court to take steps to search out ambiguous and ill-defined references that have not been submitted to the Court. Plaintiffs have the *burden* of coming forward with evidence to defeat the summary judgment motion.

Certain of the documents indicate that some persons within Xerox may have considered the savings that Xerox could realize by reducing the proportion of more veteran, higher-paid employees. One of these documents is an unsigned memorandum entitled "Executive Summary and Recommendations." Marianetti Aff. Ex. 2. This report compares the average age of Xerox's workforce with that of other companies, and suggests that reducing the median age of Xerox's employees would result in significant savings.

■ Plaintiffs allege that this document "was compiled by an employee of the defendant, T. Tyler, and was presented to the Corporate Policy Committee, the membership of which was comprised by the President and several Corporate Vice Presidents of the Defendant." Marianetti Aff. ¶ 21. As stated, however, the document is unsigned, and plaintiffs have not stated the basis for that allegation, or how they obtained the document. An attorney's affidavit about matters about which she has no personal knowledge cannot raise a material issue of fact. "An affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight." *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983). The attorney's assertion in an affidavit on a summary judgment motion is just as inadmissible as it would be in a trial on the merits. Defendant denies any knowledge of the creation or use of the document, and D. Timothy Tyler, Xerox's Manager of Human Resources for Advanced Technology and Competency Development, states that he never saw the report prior to this litigation. Affidavit of D. Timothy Tyler sworn to Feb. 2, 1994 ¶ 4.

In the absence of proper authentication, there are serious questions about the admissibility of this document. Even if it were admissible, though, it shows at most that *someone* at Xerox considered the possibility of cost reductions through lowering the average age of the workforce. While not entirely unprobative, that does not show that defendant acted upon the report by adopting a plan to get rid of older workers.

The same thing is true of the September 10, 1982 memo from one Stephen J. McGrath at RBG Personnel to Douglas M. Reid at Corporate Personnel. Marianetti Aff. Ex. 8. This memo, which concerns impending reductions at RBG, discusses the need to "reshape" RBG by reducing the proportion of more senior, higher-paid employees. Again, there is no showing that defendant actually did anything in response to this memo. It is not a directive from corporate headquarters, but the reverse: a memo to headquarters from a particular division raising certain concerns. Moreover, the thrust of the memo is that there should be greater flexibility in downgrading employees' salaries in order to *avoid* terminating large numbers of senior employees. Thus, even if it were not simply an expression of one person's opinions to corporate headquarters, the memo does not reflect any bias against older workers.

Two of the exhibits submitted by plaintiffs show that during the period when the RIFs at issue were occurring, Xerox hired some employees out of college. Marianetti Ex. 3. Xerox also decided that in upstate New York, the hiring would be done through "blind" advertising, *i.e.*, without identifying Xerox by name, to "eliminate public and employee negative reaction to recruitment advertising

the existence of material issues." *Id.* at 406. Simply providing a laundry-list of documents and deposition testimony without specifying the significance of the material is tantamount to providing no evidence at all.

"[A] district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact. In this respect, a district court may legitimately look to and rely upon counsel to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and

to distinguish those facts which are disputed from those that are undisputed.

"When counsel fails to discharge this vital function, he may not be heard to complain that the district court has abused its discretion by failing to compensate for counsel's inadequate effort." *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989).

Plaintiffs have had an opportunity to submit any materials they wished to in opposition to defendants' motions, and I will rely only on those submitted materials in deciding the motions.

while we are implementing reductions in force." Marianetti Aff. Ex. 4.

Defendant admits that it did some hiring in the 1981–83 time period. This was necessary, it asserts, to bring in employees with skills that were lacking in the company, to maintain a "pipeline" of future managerial talent, and to make up for natural attrition in the sales and administrative areas, which traditionally had a high turnover rate. Affidavit of David T. Kearns, sworn to Nov. 11, 1993, ¶ 9.

■ In my view, the fact that Xerox did *some* hiring during this time period does not create a factual issue on whether it engaged in a pattern or practice of discrimination. It is difficult to imagine a corporation this large never having to hire new employees in some areas, even during an overall reduction in force. In addition, the fact that Xerox preferred to keep this hiring quiet reflects its awareness of the obvious fact that the layoffs were unpopular with its employees, but that too does not show intentional discrimination against older workers.

What is missing here is evidence of a nexus between defendant's large-scale termination of existing employees and its limited hiring of new ones. Had Xerox's goal been to replace older workers, its workforce would not have decreased by some 18,000 employees in just a few years. Furthermore, replacement by younger workers has never been a part of plaintiffs' case, nor need it be. In a reduction-in-force case, it goes without saying that the plaintiffs were not replaced by anyone; their positions were eliminated. *Earley*, 907 F.2d at 1082. What is required is a showing of circumstances giving rise to an inference of discrimination. With respect to their allegations of a company-wide pattern or practice of discrimination, plaintiffs have not made that showing.

Plaintiffs have also submitted a Xerox "Corporate Functional Guide" which states that when a personnel surplus existed within a department, as many employees as possible should be "redeployed" to other departments before any layoffs occurred. The effect of this policy would be to keep the number of laid-off employees to a minimum. Marianetti Aff. Ex. 5.

Coupled with this document is an internal memo from RMG dated May 7, 1981 which states that "all long service employees, i.e. at least 11 years of experience," had been removed from the redeployment list. Marianetti Aff. Ex. 6. Plaintiffs contend that this demonstrates a discriminatory intent, apparently on the theory that the older employees, by not being redeployed, would be more vulnerable in the event of a layoff.

Plaintiffs, however, have not disputed or refuted defendant's contention that the senior employees were removed from the RMG redeployment list because redeployment was seen as an adverse job action, and that in fact none of the employees who were removed from the list lost their jobs as a result. Thus, this document does not support plaintiffs' claims of a pattern or practice of age discrimination. In addition, the memo concerns only RMG and does not indicate that it reflected any broader corporate policies.

An internal memo dated September 23, 1982, outlines a proposed Employment Stability Policy, which it states was to be discussed at a Corporate Management Committee meeting on September 28. Marianetti Aff. Ex. 7. Plaintiffs note a sentence in the memo stating, "Although it is difficult to prove, it seems likely that a sizable percentage of the employees who were laid off [in the past two and a half years] could have been redeployed to positions filled by new hires with better manpower planning, retraining and directed redeployment across organizational lines." *Id.* p. A1666.

Aside from the fact that the memo does not state that the layoffs disproportionately affected employees within the protected age group, it does not indicate any intent to lay off senior employees and replace them with new hires. To the contrary, the document recommends that steps be taken to ensure that layoffs "will be implemented only as a last resort." *Id.* p. A1676. Read in context, the statement concerning the laid-off employees who could have been redeployed is self-criticism suggesting that layoffs involving workers of all ages, young and old, were bad for the company and should be avoided in the

future. This does not create any inference as to intent when the layoffs occurred in the first instance.

Moreover, this memo, like many of the others submitted by plaintiffs, is not an actual statement of policy. It puts forth several alternative policies on employment stability, one of which it recommends, but it also states on its face that these were to be discussed at an upcoming meeting. Plaintiffs have not shown that anything came of that discussion.

The remaining documents submitted by plaintiffs require little discussion. One, an outline for a Xerox seminar on "Managing Your Growth at Xerox," discusses "technologically obsolescent" employees, which it describes as typically "8 + years with Xerox, 5 + years at same level, 40 + years of age, performance levels have been average or declining," etc. Marianetti Aff. Ex. 10. Yet the obvious theme of the document is that this obsolescence could be avoided and corrected with proper personnel policies and management. Rather than terminating these employees, the outline suggests that they could be retained and revitalized.

Another document, a memo concerning "VRIF and RIF Planning Instructions," likewise is not probative of any discriminatory intent. The only significance of the document, according to plaintiffs, is the instruction to "Counsel/Coach Preferred VRIF"ers." Marianetti Aff. Ex. 9. On its face, that statement is purely innocuous. Voluntary retirement packages are specifically exempted from the ADEA and are not actionable unless they are mere subterfuges for discrimination. 29 U.S.C. § 623(f)(2); *Libront v. Columbus McKinnon Corp.*, 832 F.Supp. 597, 610 (W.D.N.Y.1993). Plaintiffs have pointed to nothing in the record from which one could infer that the counseling or coaching referred to in this document was meant to be coercive.

The same is true of another internal memo regarding "RIF Policy Changes." Marianetti Aff. Ex. 8. The memo discusses various aspects of VRIFs, but nothing in it indicates a desire to apply undue pressure to employ-

ees to leave. Furthermore, the memo is nothing but a recommendation by one person, and plaintiffs have offered no evidence indicating that any of the recommendations were adopted by management.

An internal memo written by a Xerox in-house attorney advises that in calculating whether a RIF had an adverse impact on a protected group, Xerox should compare the rates of retention of protected versus non-protected employees, rather than the rates of termination, because comparison of retention rates tended to be more favorable to Xerox.[8] Marianetti Aff. Ex. 11. The memo stated that this was important "because it could have a significant bearing in future litigation brought by persons in the protected class categories."

Contrary to plaintiffs' assertions, however, this does not show that Xerox actually distorted any facts concerning the impact of the layoffs. Furthermore, how Xerox chose to calculate these figures is of far less relevance than what the figures *are*. It is the actual numbers that count, and having chosen not to present any expert analysis of the statistical data, plaintiffs' argument that this memo is evidence of a pattern or practice of discrimination is unavailing.

Plaintiffs have also submitted certain documents which purportedly show that high levels of Xerox management were involved in the RIFs. Marianetti Aff. Ex. 12. That is undisputed, however. Defendant has never contended that its corporate officers were unaware of, or had nothing to do with, the reductions. Nothing in these documents, though, even hints at a discriminatory policy, nor are these memos inconsistent with the evidence showing that many of the decisions concerning the carrying out of particular RIF's were made at much lower levels.

In addition to these documents, plaintiffs have submitted a report by their only expert, Patrick A. Gaughan, Ph.D., purporting to show that Xerox was in relatively good financial health during the early 1980s. Apparently, the inference plaintiffs seek to draw

---

8. For example, the memo stated that if 3 out of 100 older employees were terminated, and 2 out of 100 younger employees, the termination ratio would be 3/2, whereas the retention ratio would be 97/98, much closer and well within corporate guidelines.

from this is that Xerox's proffered business justifications for the layoffs is untrue.

Given the paucity of other evidence supporting the pattern-or-practice claim, this report does not make out a jury issue on this question. Even if Gaughan is correct that Xerox's troubles in the early 1980s were attributable to downturns in the national economy rather than to problems within the company itself, that fact alone does not show that Xerox adopted a pattern or practice of terminating older employees. To pass muster under the ADEA, a "business decision need not be good or even wise. It simply has to be nondiscriminatory ..." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir.1987)).

In sum, for all the reasons stated above, Xerox's motion for summary judgment on all of the twenty-three cases carried under this caption is granted on the claim that Xerox engaged in a pattern or practice of corporate-wide discrimination. There is insufficient evidence to allow any of these plaintiffs to proceed on a theory or claim that Xerox engaged in a pattern and practice of age discrimination. Therefore, each case must be considered on its merits without the benefit of any presumption or inference created by the alleged pattern and practice of discrimination.

## II. Statute Of Limitations And Its Tolling Under The ADEA

The parties dispute the timeliness of some of these actions. Under the statute of limitations provision in the ADEA, which is incorporated from the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, ("FLSA"), a complaint must be filed within two years of the alleged discriminatory act unless the complainant alleges that the discrimination was willful in which case the limitations period is three years. 29 U.S.C. § 626(e)(1). In this case, the alleged discriminatory acts occurred in 1981–1983. The complaints were all filed in the Western District of New York between June 9, 1989 and April 2, 1990.

Between the time of the alleged discriminatory acts during 1981–1983 and the time plaintiffs commenced their individual actions in the Western District of New York, all twenty-three plaintiffs were, for a time, members of the *Lusardi* class action. It is not disputed that for statute of limitations purposes relative to the Western District of New York actions, some of the time is tolled by virtue of plaintiffs' membership in the *Lusardi* class action. The parties dispute how much time should be excused from the statute of limitations calculation.

The issue between the parties is easily framed: Xerox contends that the tolling period for each plaintiff did not commence until the time that plaintiff personally opted-in to the *Lusardi* class. Xerox contends that § 256 of the FLSA has been incorporated into the ADEA and § 256 tolls the statute of limitations from the opt-in date. In addition, Xerox contends that this issue concerning tolling has already been determined in the *Lusardi* action itself and that under the law-of-the-case principle, all plaintiffs are bound by that prior determination and may not relitigate the matter here.

Plaintiffs, on the other hand, contend that the proper date to commence tolling for all former members of the conditionally-certified class, is the date that the initial complaint was filed in New Jersey, commencing the *Lusardi* action. Plaintiffs contend that the dates they individually opted-in to the class are irrelevant for purposes of determining tolling. Plaintiffs further contend that there is no decision in the *Lusardi* class action dealing with this precise issue and, therefore, the matter is properly before this Court.

A determination as to when tolling commences has significant impact on this case. If Xerox's calculation is correct, then plaintiff Walter Pidek's complaint would be time-barred and eighteen of the remaining twenty-two complaints would have been deemed filed more than two but less than three years after the discriminatory act and, therefore, those plaintiffs would have to prove willfulness. On the other hand, if plaintiffs' theory is accepted, then all of the plaintiffs' complaints are timely and none of them have to meet the higher burden of proving that the discrimination was willful.

### Law of the Case

■ After review of the several decisions in *Lusardi,* I do not find Xerox's law-of-the-case argument persuasive.

Xerox contends that Judge Lechner determined the tolling date for the plaintiffs' claims in *Lusardi* and, therefore, under the-law-of-the-case doctrine, this Court should stay its hand. Xerox claims that the form Notice of Decertification to Conditional Class Members ("Notice") that accompanied Judge Lechner's order, entered November 10, 1988, decertifying the class constitutes a decision that tolling began when each plaintiff opted-in to the class. The Notice advised the class members that "[t]he statutes of limitations applicable to your federal age discrimination claim against Xerox have been tolled, or stayed, from the time you filed your consent to join this law suit. As a result of the court's decision to decertify this case as a class action, that stay will expire as of midnight December 23, 1988." Notice, p. 2.

Plaintiffs contend that the Notice is not the law of the case. Plaintiffs argue that the Notice was not an order and that the tolling issue was not litigated before Judge Lechner.

The law-of-the-case doctrine requires that "a decision on an issue of law made at one stage of the case becomes a binding precedent to be followed in successive stages of the same litigation." 1B Moore's Federal Practice ¶ 0.404[1]. The practical impact of this doctrine is " 'that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Christianson,* 486 U.S. at 816, 108 S.Ct. at 2177 (quoting *Arizona,* 460 U.S. at 618, 103 S.Ct. at 1391). The doctrine applies as much to the decisions of coordinate courts as to a court's own decisions. *Id.* The doctrine of the law of the case "is a discretionary doctrine which 'merely expresses the general practice of refusing to open what has been decided.' " *Diduck v. Kaszycki & Sons Contractors, Inc.,* 737 F.Supp. 792, 796 (S.D.N.Y.1990) (quoting *Lasky v. American Broadcasting Companies, Inc.,* 631 F.Supp. 962, 964 (S.D.N.Y. 1986) and *United States v. Birney,* 686 F.2d 102, 107 (2d Cir.1982)).

I do not believe that the Notice was a decision on an issue of law in this case. The decision to *decertify* the class was clearly an issue of law that the *Lusardi* Court resolved. However, to interpret the Notice to former members of the class as a final decision on any issue other than class decertification would be an overextension of the doctrine of-law-of-the-case.

"As a general rule, 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to do battle again.' " *U.S. v. Martinez,* 987 F.2d 920, 923 (2d Cir.1993) (quoting *Zdanok v. Glidden Co., Durkee Famous Foods Div.,* 327 F.2d 944, 953 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)).

Xerox has failed to convince me that the parties "did battle" concerning the applicable tolling date. There is nothing before me to indicate that the issue was ever briefed or argued. The Notice attached to Judge Lechner's decertification order notified class members that the case had been decertified, that each plaintiff could pursue his own action, and that the stay of the statute of limitations period would expire within about a month, on December 23, 1988. This Notice, although attached to Judge Lechner's order, was not signed by Judge Lechner but by the Clerk of the District Court. There is no evidence that the parties participated in the drafting of this Notice or consented to all of its terms.

On the state of this record, I am not prepared to rule that the issue of tolling was litigated between the parties in the *Lusardi* action. Because of the decertification order, issues concerning tolling were not before the *Lusardi* court, and there would be no need for Judge Lechner to entertain argument and rule on that aspect of the case. The record is simply not clear enough for me to hold now that the parties should be precluded from litigating this issue because of prior rulings in the *Lusardi* case.

In any event, the law-of-the-case doctrine is a discretionary one and a court may reconsider prior issues. *Martinez,* 987 F.2d at 923. Therefore, even if Judge Lechner's decision dealt with this tolling issue, which did

not occur in my judgment, this Court could reconsider the matter if I believed it had not been properly or thoroughly briefed and argued between the parties. I conclude therefore that because the basis for Xerox's law-of-the-case argument rests on such a slim reed, that is, the Notice, this Court will consider the matter on the merits.

### *Tolling Under the ADEA*

On the merits, I believe that the better view, the one more consistent with class action principles under the ADEA, is that tolling commences for statute of limitations purposes for subsequently filed complaints, when the initial class action complaint was filed and not when class members opted into the certified class.

If this case had been prosecuted as a class action under Fed.R.Civ.P. 23, the result would be clear concerning tolling. Generally, the claims of all members of a class action are tolled from the date the first action is filed. The Supreme Court in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), ruled that the commencement of a class action tolls the statute of limitations for all class members. *Id.* at 554, 94 S.Ct. at 766–67. The statute of limitations is tolled for all class members regardless of whether the class is later decertified. As Justice Stewart explained "[w]e are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* Claims are tolled from the filing of the first action to prevent filing of numerous motions to join or intervene and preserve the "efficiency and economy of litigation" that is the principal purpose of Rule 23. *Id.* at 553, 94 S.Ct. at 766.

Xerox contends that because the actions are brought not under the general class action statute, Rule 23, but under the ADEA, a more restricted rule applies concerning tolling. Resolution of this issue, therefore, involves an analysis of the statutory provisions of both the ADEA and the FLSA.

In some instances, the ADEA explicitly incorporates provisions of the FLSA. For example, the ADEA explicitly incorporates §§ 255 and 259 of the FLSA. *See* 29 U.S.C. § 626(e).

The crucial section that is disputed is § 256 of the FLSA. That section provides that:

> In determining when an action is commenced ... it shall be considered to be commenced in the case of any individual claimant—
>
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear— on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.

By virtue of § 256, it does appear under the FLSA that tolling commences at the time the plaintiff opts into the class action. The ADEA is, on its face, silent on this issue, and it is clear that there is no explicit incorporation in the ADEA of § 256 of the FLSA. Furthermore, I do not believe that there is persuasive authority that § 256 has been incorporated by inference.

The majority of courts that have considered this issue have held that the ADEA has not incorporated § 256 of the FLSA and, therefore, the more restrictive rule for tolling under the FLSA does not apply. *See Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *Sperling*, 145 F.R.D. at 360 (D.N.J.1992); *Mooney v. Aramco Services Co.*, 764 F.Supp. 461, 463 (S.D.Tex.1991); *Vivone v. Acme Markets, Inc.*, 687 F.Supp. 168, 169 (E.D.Pa.1988).

In a thorough discussion of the issue, Judge Ackerman in *Sperling* stated that an "[a]nalysis of the statutory scheme of the ADEA, the existing case law, and the policies and goals underlying class actions and stat-

utes of limitations, persuades me to find that the best resolution of this issue is that the statute of limitations is tolled [from the commencement of the lawsuit] in ADEA class actions." *Sperling*, 145 F.R.D. at 360.

The fact that the ADEA has incorporated other provisions of the FLSA is not problematic. On the contrary, it suggests that Congress was selective. As the Supreme Court noted: "[I]n enacting the ADEA, Congress exhibited both a detailed knowledge of the FLSA provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation." *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). Judge Ackerman relied on this observation from the Supreme Court to conclude that "Congress' failure to expressly incorporate Section 256 is a clear indication that it did not intend to prevent legal tolling principles from applying in ADEA class actions." *Sperling*, 145 F.R.D. at 360. In other words, the intent is clear that Congress intended the general tolling provisions which normally apply in Rule 23 situations to govern the matter in ADEA actions.

While the ADEA and FLSA share some procedural similarities, the relationship between Title VII class actions, which are governed by Rule 23, and the ADEA is even closer. "The ADEA and Title VII share a common purpose and many substantive law provisions. They also contain similar administrative exhaustion requirements. Thus, it is reasonable that Congress intended the tolling rule applicable to Title VII cases to apply, rather than the non-tolling rule of Section 256 of the FLSA. Courts have looked to and applied other Title VII procedural aspects to ADEA class actions." *Id.* at 361 (citations omitted). *See also Vivone*, 687 F.Supp. at 169 (concluding that incorporation of 29 U.S.C. § 216(b) and exclusion of § 256 is reasonable conclusion because they address different concerns).

There are two cases that support Xerox's view that tolling does not begin until the opt-in date of each plaintiff. *See O'Connell v. Champion Int'l Corp.*, 812 F.2d 393 (8th Cir.1987) and *Owens v. Bethlehem Mines*

*Corp.*, 630 F.Supp. 309, 311 (S.D.W.Va.1986). Both courts conclude that Congress intended to incorporate the provisions of § 256 into the ADEA and, therefore, in an ADEA class action the opt-in date commences the tolling period. I find neither case persuasive, in part because both courts so ruled without any discussion or analysis. Therefore, I decline to follow those two cases. I believe the cases cited above, which I believe represent the majority view, establish the better rule.

Furthermore, I believe that the policy reasons underlying the ADEA support the conclusion that § 256 of the FLSA has not been incorporated into the ADEA. The Supreme Court has stated that the ADEA should be construed liberally in order to effectuate its goal of eradicating age discrimination. *See Hoffman–La Roche v. Sperling*, 493 U.S. 165, 173, 110 S.Ct. 482, 487–88, 107 L.Ed.2d 480 (1989). To extend Congress' incorporation of the FLSA would restrict the rights of claimants and would defeat the policy objectives that were intended in the ADEA.

### CONCLUSION

I. Xerox's Motion For Summary Judgment is granted in part and denied in part on issues affecting all of the plaintiffs, as follows:

A. To the extent that Xerox moves for summary judgment claiming that some plaintiffs' actions are barred by the statute of limitations or that plaintiffs must prove willfulness, under 29 U.S.C. § 626(e)(1), the motion is denied as to all plaintiffs;

B. To the extent that Xerox seeks summary judgment on plaintiffs' claims that it engaged in a pattern or practice of age discrimination, its motion for summary judgment is granted against all plaintiffs. Plaintiffs are all precluded from relying on or attempting to establish before a jury the allegation that Xerox engaged in a pattern or practice of age discrimination.

II. In light of this decision, the Court will review the separate summary judgment motions filed by Xerox relative to each individu-

al plaintiff, and the Court will issue a subsequent decision or decisions on those motions.

IT IS SO ORDERED.