Diane CALABRITTO, Plaintiff,

v.

Nassau County District Attorney Denis DILLON, Defendant.

No. CV 94–0073 (ADS).

United States District Court, E.D. New York.

March 31, 1996.

373

Gaba & Stober, Mineola, New York (Louis Stober, of Counsel), for Plaintiff.

Bee & Eisman, Mineola, New York (Peter A. Bee, of Counsel), for Defendant.

374

## MEMORANDUM AND ORDER

SPATT, District Judge.

The issues in this case concern a charge of gender discrimination in the setting of the Office of the District Attorney of Nassau County. The plaintiff, an Assistant Detective Investigator II in the Office of the defendant District Attorney, contends that her discharge was motivated by gender discrimination.

## BACKGROUND

The plaintiff Diane Calabritto ("the plaintiff" or "Calabritto") was first employed by the defendant District Attorney of Nassau County ("the defendant" or "the District Attorney" or "The Office") as an Assistant Detective Investigator Aide on March 23, 1984. On or about March 27, 1988, Calabritto was promoted to Assistant Detective Investigator I. She was promoted to Assistant Detective Investigator II on or about April 24, 1989. In 1990, the plaintiff was assigned to the United States Customs Task Force ("the Task Force"). The plaintiff was terminated from her employment with the District Attorney on or about January 24, 1992.

The plaintiff filed a discrimination claim against the District Attorney with the United States Equal Employment Opportunity Commission Division of Human Rights, which made a determination that the District Attorney did not violate the Title VII statute, as follows:

> Examination of the evidence reveal that Charging Party was terminated as a direct result of budgetary constraints. Charging Party's title was that of 'Assistant Detective Investigator I'. On January 17, 1992, Nassau County District Attorney's Office laid of (sic) several persons with the same title as Charging Party. This included two other males and the Charging Party. No persons in the same job title as the Charging Party's job was retained, nor was there anyone hired or re-hired in the job title of Assistant Detective Investigator I since January 17, 1992.

In January 1994, the plaintiff commenced this action alleging employment discrimination, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).

## DISCUSSION

### I. The Standards in a Title VII Case

#### A. McDonnell Douglas—Burdine—Hicks Pretext Cases

"Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq., makes it an unfair employment practice for an employer to discriminate against any individual with respect to ... the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin." Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 645, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 (1989); Fisher v. Vassar College, 70 F.3d 1420 (2d Cir. 1995); Bridgeport Guardians, Inc. v. City of Bridgeport, 933 F.2d 1140 (2d Cir.), cert. denied, 502 U.S. 924, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991).

As the Supreme Court observed in Griggs v. Duke Power Co., 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), "[t]he objective of Congress in the enactment of Title VII ... was to achieve equality of employment opportunities and remove barriers that have operated in the past...." Under Title VII, discrimination can be demonstrated through evidence of either 'disparate treatment' or 'disparate impact.' To show 'disparate treatment,' the plaintiff is "required to prove that the defendant had a discriminatory intent or motive." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). 'Disparate impact' is based upon the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." Id. at 987, 108 S.Ct. at 2785. The evidence in 'disparate impact' cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those dispari-

ties." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033 (2d Cir.1993).

▇ In this action, in a broadly worded complaint drawn by a *pro se* plaintiff, who was later represented by counsel, she apparently alleged both a "disparate treatment" and "disparate impact" Title VII claim. To establish a discriminatory treatment claim under Title VII, proof of discriminatory motive is critical. Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991).

▇ As stated recently in *Fisher v. Vassar College, supra,* a Title VII claim, including one alleging discriminatory treatment, is tried by a three-step process. In the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court devised a three-tiered burden shifting framework in Title VII cases. In the first tier, the plaintiff must prove a *prima facie* case, which, in a gender discrimination case such as this, consists of four elements: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position she held at the time of her termination; (3) that the plaintiff was terminated from her position; and (4) that her termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's gender.

▇ The next two tiers are described in *Fisher,* as follows:

If the plaintiff presents a *prima facie* case, the burden shifts to the employer, who is required to demonstrate "some legitimate, nondiscriminatory reason" for the decision. *Id.* The employer's burden here is one of production of evidence rather than one of persuasion. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant need only articulate—but need not prove—the existence of a non-discriminatory reason. *Id.* at 254–56, 101 S.Ct. at 1094–95.

If the defendant carries this burden of production, the plaintiff then assumes the burden to "show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. In *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court held that, as to the third prong of the *McDonnell Douglas* test, it is not enough for a plaintiff to show that the defendant's legitimate, non-discriminatory reason for its employment decision is pretextual; the plaintiff must also prove by a preponderance of the evidence that defendant's stated reason is "a pretext *for discrimination." St. Mary's,* 509 U.S. at 516, 113 S.Ct. at 2752 (emphasis added). The plaintiff must establish *"both* that the reason was false, *and* that discrimination was the real reason."

*Id.* at 1433 (emphasis in original).

As stated above in *Fisher,* under the third tier of the *McDonnell Douglas* pattern, as clarified in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), even if the trier of fact rejects the defendant's submission that its reasons were justified, the burden of proving that the motivation for the failure to promote the plaintiff was unlawful remains with the plaintiff. *St. Mary's Honor Center v. Hicks, supra,* 509 U.S. at 510, 113 S.Ct. at 2749 (1993) ("[T]he Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff … ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' ") (emphasis in original).

In *Hicks,* the United States Supreme Court eliminated the uncertainty that had developed as a result of certain lower court decisions as to the plaintiff's burden of proof in a Title VII action after the plaintiff had established "pretext." *See id.* at 512, 113 S.Ct. at 2750. In so doing, the Court confirmed that a plaintiff cannot merely establish that the employer's "proffered reason

was not the true reason for the [challenged] employment decisions" and, without more, expect to prevail. *Id.* at 508, 113 S.Ct. at 2748 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). The *Hicks* Court went on to state:

> We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, that the employer has unlawfully discriminated. We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

*Id.* at 514–15, 113 S.Ct. at 2751.

In a series of cases, the Second Circuit has interpreted and clarified the *Hicks* ruling. For example, in *DeMarco v. Holy Cross High School,* 4 F.3d 166 (2d Cir.1993), it was stated:

> Proof that the employer has provided a false reason for its action permits the finder of fact to determine that the defendant's actions were motivated by an improper discriminatory intent, but does not compel such a finding.

*Id.* at 170. Recently, these rules were reiterated by Judge Winter in *Binder v. Long Island Lighting Company,* 57 F.3d 193 (2d Cir.1995), who added:

> Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct. In so stating, we do not exclude the possibility that an employer may explain away the proffer of a pretextual reason for an unfavorable employment decision. *See Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 n. 3 (1st Cir.1994).

*Id.* at 200. Thus, even if the defendant's reasons are found to be pretextual, the plaintiff must, nevertheless, prove that she was terminated as a result of intentional discrimination. "It is not enough ... to disbelieve the employer: the factfinder *must* believe the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 519, 113 S.Ct. at 2754. However, this proof may be inferred from proof of the four elements of the *prima facie* case.

**B. Mixed Motives Theory**

█ Employment discrimination cases may fall into one of several categories, including "pretext" or "mixed motive." *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). These two approaches involve different analyses. Under a mixed motive theory, a plaintiff "must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors." *Id.* at 1181. If the plaintiff is able to produce evidence to establish that an illegitimate factor played a motivating or substantial role in the challenged employment decision, the defendant is then given an opportunity to prove an affirmative defense, namely, that the defendant " 'would have reached the same decision as to [the employee's employment] even in the absence of the' impermissible factor." *Id.* (quoting *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

█ The question is what does the plaintiff have to show in order for the burden to shift to the defendant. In the Second Circuit, the plaintiff is required to submit "enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Id.* at 1187. The Second Circuit rejected the notion that the plaintiff must introduce "direct" evidence of discrimination (such as an admission by the decisionmaker that "I fired the plaintiff because she was a woman") as opposed to circumstantial evidence. *Id.* at 1185–87. However, if the plaintiff relies on circumstantial evidence, "that circumstantial

evidence must be tied directly to the alleged discriminatory animus." *Ostrowski v. Atlantic Mutual Insurance Co.,* 968 F.2d 171, 182 (2d Cir.1992).

 In *Ostrowski,* Judge Kearse explained that the plaintiff would not be entitled to a 'mixed motive' burden shifting instruction based on (1) purely statistical evidence; (2) mere evidence of the plaintiff's qualification for, and the existence of, a certain position; or (3) 'stray' remarks in the workplace by persons not involved in the relevant decisionmaking process. *Id.* at 182. In other words, evidence that would satisfy the requirements of a *McDonnell Douglas prima facie* case, would not necessarily justify a *Price Waterhouse* 'mixed motive' charge. Statistical evidence that is "directly tied to the forbidden animus, for example policy documents or statements of a person involved in the decisionmaking process that reflect animus of the type complained of in the suit" will entitle the plaintiff to a burden shifting instruction. *Id.* To qualify for a 'mixed motive' instruction, the plaintiff must introduce "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence [must be] sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Id.*

### C. A Pattern or Practice Case

 There is another method to prove gender discrimination under Title VII. In a so-called "pattern and practice" case, if the plaintiff can establish "that (gender) discrimination was the company's standard operating procedure—the regular rather than the unusual practice," *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977), the burden then shifts to the employer to demonstrate that the plaintiff's proof is "either inaccurate or insignificant." *Id.* at 360, 97 S.Ct. at 1867. *See also Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1267–68, 47 L.Ed.2d 444

(1976); *Ottaviani v. State U. of New York at New Paltz,* 875 F.2d 365 (2d Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990). If the employer fails to carry its burden in the liability phase of a pattern and practice case, then the individual plaintiff who challenges a decision that was made pursuant to the discriminatory pattern and practice is presumed to have been a victim of discrimination. *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868. "The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Id.* The employer then has the burden to demonstrate that the individual employment decision was made for lawful reasons. *Id.*

Calabritto argued that this is a "pattern and practice" case, which should be resolved by application of the *Teamsters* analysis. She further urged the Court that the defendant should bear the burdens of proof and persuasion in rebutting the prima facie showing of discrimination and cites various authority in support of this allocation. *See Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir.1984) (in pattern and practice case, the employer bears burden of production and persuasion to show that it is more likely than not that it did not discriminate against the individual); *see also Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.1986), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *In re Western Dist. Xerox Litigation,* 850 F.Supp. 1079, 1082 (W.D.N.Y.1994).

The defendant challenged the plaintiff's proposed allocation of the burden of proof in a "pattern and practice" case, as well as its applicability to a lawsuit involving the claims of one individual. Applying the *Teamsters* analysis in a "pattern and practice" case, the Second Circuit commented that "even though the burden of production shifts to the defendants during the second stage of the process, the ultimate burden of persuasion rests always with the plaintiffs to prove their claims of discrimination." *Ottaviani, supra,* 875 F.2d at 369–70. The Court agrees with the defendants that this case differs from the

class action "pattern and practice" cases in which systemic discrimination is shown by the plaintiffs to make out a prima facie case. Indeed, some courts have questioned the applicability of the *Teamsters* analysis to individual plaintiff discrimination suits. For example, it was noted that

> It is also questionable whether it would be appropriate in this litigation to try the pattern and practice issue separately, regardless of the strength of plaintiffs' evidence. Trials of that discrete issue generally occur in the context of class actions or suits brought by the Government which follow the *Teamsters* paradigm.

*Xerox, supra,* 850 F.Supp. at 1083; *see also Gilty v. Village of Oak Park,* 919 F.2d 1247 (7th Cir.1990) (pattern and practice evidence is only collateral to evidence of specific discrimination against individual plaintiffs); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866 n. 6 (7th Cir.1985) (pattern and practice argument seems to be misplaced in nonclass suits); *Craik, supra* 731 F.2d at 471 ("in this case we squarely confront the necessity of distinguishing the analysis required for broad-based class actions from that required for individual, non-class actions"). *But see, Cox supra,* 784 F.2d at 1559 (where individual plaintiffs demonstrate that they are victims of a discriminatory policy, rather than one instance of unlawful discrimination, "these individuals were in substantially the same position as the *Teamsters* and *Franks* plaintiffs").

However, even assuming the applicability of the *Teamsters* analysis to a single plaintiff discrimination action, it is the Court's view that this case is appropriately resolved by using the three-tiered burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## II. *The Trial—Findings of Fact*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

The titles of Detective Investigator and Special Investigator in the Office of the District Attorney of Nassau County were created in 1968 as separate titles. At that time it was determined that the Special Investigators performed a highly specialized criminal investigative function with regard to "crime families," distinct and different from the more general criminal investigative function of the Detective Investigator (Plaintiff's Exh. 1C).

Denis Dillon has been the District Attorney of Nassau County since January of 1975. He testified that the main mission of his office is to prosecute criminal cases. Under Dillon in the table of organization in the Office of the District Attorney of Nassau County is Lawrence Leff as Chief Assistant and Patrick McClosky as Executive Assistant for Administration. Leff supervised the investigative bureau and made the final decisions as to whether to hire or promote investigators, subject to Dillon's approval.

Dillon discussed the rationale for the creation of the titles of Assistant Detective, Assistant Detective Investigator I, and Assistant Detective Investigator II, as follows:

> There did come a time that I had discussions with Larry Leff about bringing on people who did not have investigative background that could be used for the kinds of investigations that they were doing, and that it would be more economical for the District Attorney's Office not to pay the high salaries we were paying for people with long-time previous investigative experience, such as retired police officers and detectives....

> We felt restrained in doing undercover type of investigations we wanted to do. We were doing a lot of investigations into the commercial frauds area, for example. And where we wanted the people who would not be easily recognizable as District Attorney's investigators to be used....

> What we were looking for and what we sought to get were women, minorities, young people. (Tr. at 145–146).

On the same subject, Executive Assistant District Attorney for Administration McCloskey stated:

THE COURT: And you say this was designed to get more inexperienced, if I may use that, type of investigators into the system.

Why would you want inexperienced investigators?

THE WITNESS: Mr. Leff could answer it better. But from my vantage point, I believe it was that many of the people who qualified for the Special Investigator title were retired police.

Many of those who applied for the Detective Investigator were also retirees. And it was thought that if we could get some younger people in there—of course, the younger people didn't have the experience, so we couldn't hire them—that it might give us more versatility with respect to investigative work. That was the thinking of the 80's.

THE COURT: Versatility would include undercover, female undercover?

THE WITNESS: Yes, minority undercover.

THE COURT: And minority undercover?

THE WITNESS: Yes, your Honor. (Tr. at 426–27).

However, there is no doubt that these relatively inexperienced persons discussed above, were the ones who were laid off in the January 1992 terminations and they were never rehired. Dillon testified that the plan in The Office in 1992 and thereafter, was to hire financial investigators, who are primarily retired police officers or federal agents and these investigators are primarily male and not women or minorities.

Diane Calabritto was first employed by the County of Nassau on June 1, 1982 in the office of the Nassau County Department of Motor Vehicles. Despite the plaintiff's testimony that she had prior general investigative experience as a cashier with the Department of Motor Vehicles, the Court finds that the plaintiff has no prior criminal investigative experience. On March 23, 1984 she was hired by the Office of the District Attorney

of Nassau County as an Assistant Detective Investigator Aide ("Aide"). This was a permanent appointment after the plaintiff passed a civil service test and served a probationary period.

During the period of 1984 to 1992, the investigators in the District Attorney's Office consisted of the following classifications:

Assistant Detective Investigator—Aide, I, II (Pay Grades 6, 9 and 11)

Detective Investigator (Pay Grade 13)

Investigator Coordinator (Pay Grade 14)

Special Investigator I, II (Pay Grades 15, 16)

Financial Investigator I, II (Pay Grades 15, 17)

Environmental Conservation Investigator (Pay Grade 17)

The plaintiff was aware that the various investigative positions within the Office of the District Attorney of Nassau County required different qualifications. In order to take the tests for the various investigative positions, there were different qualifying requirements. For example, Assistant Detective Investigator I had higher requirements than the Aide position; and Detective Investigator had higher qualifications than Assistant Detective Investigator. The same was true going right up the ranks as to Investigator Coordinator, Special Investigator and Financial Investigator. Each successive rank required greater qualifications.

In the same vein, the "training and experience" required for Assistant Detective Investigator II was graduation from high school and two years of general criminal investigation work, while the "training and experience" required for Special Investigator I was graduation from high school and "ten years of experience in criminal investigation work, of which five years must have been in the specialized field of investigation of syndicated organized crime, including narcotics, syndicate operated gambling, bookmaking, policy, loansharking, etc." The "training and experience" required for Financial Investigator I was a bachelor's degree, including courses in accounting and "five years of satisfactory experience in the FBI, IRS or NYS Tax

Department investigating financial fraud." (See Defendants' Exh. C).

The plaintiff passed the test for Assistant Detective Investigator I and she was appointed on March 27, 1988. As an Assistant Detective Investigator I, the plaintiff's duties were the same as an Aide, in that she conducted interviews, collected evidence and did undercover surveillance. The plaintiff carried a gun, drove a County car and was considered a police officer. In 1988, the plaintiff attended a peace officer course at the Nassau County Police Academy.

According to the plaintiff, all the Assistant Detective Investigators and the more senior Special Investigators "worked side by side ... (and) we each did the same type of work." (Tr. at 20). However, the plaintiff conceded that as an Assistant Detective Investigator II, her responsibilities increased, she had a greater caseload and she was assigned to the Task Force. In addition, the Court finds that on occasion, the more complex situations would be given to a more experienced investigator. Such an experienced investigator, for example, was Dennis Sheehan, an Investigator Coordinator, who had 38 years of law enforcement experience, including 17 years as a detective in the Police Department.

In 1989, the plaintiff passed the civil service test for Assistant Detective Investigator II and was appointed to that position on April 24, 1989. The plaintiff remained an Assistant Detective Investigator II until her termination on January 24, 1992. In 1990, the plaintiff passed the Detective Inspector Civil Service examination. She was then placed on an eligible list which expired in December, 1994. However, she was never promoted to the position of Detective Investigator. As stated above, the plaintiff testified that her duties as an Assistant Detective Investigator II were the same as an Aide or an Assistant Detective Investigator I. During her tour as an Assistant Detective Investigator, the plaintiff testified at a civil trial in May 1989, and was commended by the Office of the Nassau County Attorney. (Plaintiff's Exh. 1F).

There was another investigative title in the District Attorney's Office in 1989 called a Financial Investigator whose duties were to conduct highly complex financial investigations. However, according to the plaintiff, the Financial Investigators were assigned the same caseload as the other investigators.

As to the method of making assignments to the various investigators, the plaintiff testified that the Chief Investigator made the assignments by a random selection from a list of all the investigators. According to the plaintiff, all of the investigators, regardless of grade, were treated equally with regard to assignments and duties. In a memorandum to Leff dated September 22, 1988, the plaintiff noted that Dillon stated that "persons in both positions perform the same job functions." (Plaintiff's Exh. 29). The Court finds that there was no gender discrimination by the District Attorney in the random assignment of jobs. The plaintiff, herself, testified that the jobs were assigned to all the investigators, regardless of title, in rotation.

In February 1990, the plaintiff was selected for a different assignment, the United States Customs Task Force ("the Task Force"), in Bohemia, New York. Calabritto was selected by Dillon himself, and she was the first woman from the District Attorney's Office assigned to a Task Force. In the Task Force there were detectives from the Nassau County Police Department, the Suffolk County Police Department and Special Agents from the Internal Revenue Service and the United States Custom Service. Of interest, the plaintiff was selected for the Task Force instead of a more experienced male investigator who also applied for the job. This Task Force conducted long-term financial and money laundering investigations. She was the only representative of the Nassau County District Attorney's Office on the Task Force. During the time she served on the Task Force, which was from February 1990 until her discharge in January 1992, she was no longer physically located in the District Attorney's Office but was situated in Bohemia, New York. As a member of the Task Force, the plaintiff attended a cross-designated training school. Her job assignments included conducting surveillances, serving subpoenas on bank records, making

arrests and performing detailed analyses of bank and corporate records. In 1990 and 1991, while the plaintiff was on the Task Force, she worked overtime and received approximately $8,000 in overtime payments each year. Her overtime payments were made by the District Attorney's Office and The Office was reimbursed by the U.S. Customs Service. As stated above, the plaintiff remained at the Task Force from February 1990 until the date she was terminated, January 24, 1992.

In March 1991, the plaintiff was advised by Chief Investigator John Murphy that her services were no longer required on the Task Force. In this decision, Murphy said he was acting on behalf of Chief Executive Assistant District Attorney Lawrence Leff. The plaintiff was told that she was being removed from the Task Force because of her overtime payments, in that she "submitted a lot of overtime" (Tr. at 33). At the same time the plaintiff was on the United States Customs Task Force, another District Attorney Investigator Vinnie Martinez, was on the United States DEA Task Force, under a similar overtime arrangement, namely with ultimate reimbursement by the Federal Agency. However, according to the plaintiff, Martinez did not have to go through as complicated a paper trail procedure as she did in order to get paid. The plaintiff asserted that this difference in procedure for obtaining overtime payments, was evidence of gender discrimination. However, the Court finds that the reason for the dissimilar methods of obtaining overtime payments was the difference in the reimbursement routines of the DEA Task Force and the Customs Task Force. With respect to the DEA Task Force, Nassau County was not reimbursed until the end of a quarter; in the case of the Customs Service, the reimbursement period was every two weeks, so that more paperwork was required by the Customs Task Force representative.

The plaintiff then communicated with Leff and reminded him that the United States Customs Task Force was a source of additional funds for the District Attorney's Office in that, if the District Attorney had a member on the Task Force, it would participate in asset sharing in forfeiture proceedings conducted by the Task Force. In addition, she reminded Leff that her overtime payments were fully reimbursed by the Federal Government. Calabritto later received a reprieve and was advised that she could stay on the Task Force. Leff himself explained that he wanted to replace the plaintiff on the Task Force so that other investigators could share in the overtime payments.

In the Fall of 1991, Leff again told the plaintiff that she was no longer to be on the Task Force, this time stating that the change was to give other people a chance. The plaintiff expressed her desire to remain with the Task force. She explained that other people in the District Attorney's Office were assigned to Task Forces for longer periods of time and that she needed additional time to complete certain long-term investigations. Leff then held a meeting with all the investigators and explained that the Task Force would be run on a two-year rotating basis from that time on. Under this policy the plaintiff and Martinez would both be removed from the Task Force in March 1992.

In 1991, the plaintiff became aware that there was a budget crisis in Nassau County. In fact, as the union representative, she attended an emergency union meeting on that subject. In 1991, the District Attorney submitted its 1992 budget proposal to the County Executive. The salaries of the employees in The Office constitute approximately ninety percent of the District Attorney's budget. In the fall of 1991, Dillon was advised by the County Executive of Nassau County that there was an extremely serious fiscal crisis and a shortfall in revenue and that all department heads would have to cut back expenditures. Dillon communicated with his senior staff, Leff, McCloskey and Harvey Levinson, advised them that they would have to be very careful in drawing the budget and told them to propose "a very tight budget." The 1992 budget was markedly reduced by the County Executive and the Board of Supervisors. The County Executive cut the District Attorney's request by 4 million to 5 million dollars, and the Board of Supervisors made further cuts. Keeping in mind the mission of The Office to prosecute criminal

cases, Dillon and the senior staff tried to select options which would least inhibit the performance of that mission. Finally, Dillon, Leff and McClosky arrived at a consensus as to what personnel should be asked to leave, taking into consideration the fact that certain people were already leaving at about that time.

In December 1991, Dillon had conversations with Leff and McCloskey to decide what persons to terminate. Dillon testified that in all his conversations with Leff and McCloskey about layoffs, the topic of the sex or gender of any individual employee was not discussed and was not a consideration in formulating the decisions to terminate. He stated that he did not terminate Diane Calabritto because of her sex. In the final analysis, Dillon testified that gender had nothing to do with the layoffs, and, insofar as the investigators are concerned, he laid off two men and one woman, the plaintiff.

Under the figures in the original 18 million dollar budget projected for 1992 no lay-offs would be required. However, the 1992 budget initially adopted by the County Executive and the Board of Supervisors was cut to $14,200,000, requiring the lay-offs made and deficit spending. Ultimately, however, in April 1992, after the plaintiff was terminated, the County Executive and the Board of Supervisors, in various money-raising plans, rescinded all the budget cuts in the 1992 budget.

As a result of the estimated budget deficit, it was decided to terminate nine employees in the office. In addition, four assistant district attorneys who planned to resign, did so, together with another assistant whose resignation was requested. The terminations in January 1992 consisted of fourteen employees in the Office of the District Attorney, of whom seven were males and seven were females. Of greater relevance, three Assistant Detective Investigators were terminated, two, Victor Bartolotto and Douglas Delyra, were male, one, the plaintiff, was a female. (See Defendants' Exh. B). Of the nine persons laid off, Robert Lee, a non-investigator, was rehired as the security control officer; William Dwyer was employed by the County of Nassau and not the District Attorney, and Carol Blumenberg was rehired by the District Attorney as a crime victim's advocate.

On December 19, 1991, the plaintiff was called in by Leff and told that "there was a fiscal crisis and that I was low man on the totem pole and was going to be terminated." Apparently, Leff erroneously thought that her seniority was from 1988, while in actuality it was from the year 1984. The plaintiff responded that she was "far from the low man on the totem pole, and that it didn't make sense to lay me off." She stated that she was one of the lowest paid investigators in the office and was assigned to the Task Force and brought money into the office.

The plaintiff then spoke to McCloskey and three senior investigators to try to save her job. She also spoke directly to District Attorney Dillon. She told Dillon: "that I had nine years and seven months (in), and (was) four months away from being vested. I was a single mother. I had three children. I basically begged to be perfectly honest with you, for him to find another way. I told him that ... the employees had circulated a petition to—so the District Attorney could save money, they would be willing to give up a vacation day or a comp day, for the money to go back in the budget. He wasn't interested." McCloskey was more sympathetic but there was nothing he could do.

After the plaintiff's termination, she was replaced on the Task Force by Dennis Sheehan, an Investigator Coordinator, followed by Kenneth Cozza and Ray Lulenski. Also, as a result of her layoff, the plaintiff asserts, without corroboration, that the District Attorney's Office lost forfeiture money. After her discharge, the plaintiff was placed on a preferred civil service list for a period of four years.

At the time of her discharge, the plaintiff, as an Assistant Detective Investigator II was being paid a salary of $33,172. At her termination, she received the sum of $19,432.36 as a total package of severance pay, which included vacation pay, sick leave and longevity pay. In mitigation of her damages, the plaintiff introduced evidence as follows:

In 1992, she received compensation from the County of Nassau, including salary and severance pay of $23,083.92. In 1992, she also received unemployment insurance payments of $6,900. In addition, in 1992, she received other income, as follows:

Compass Advisory Group $9,384.61
Federal Government 8,041.23

In 1992, the plaintiff received income of approximately $47,000, or about $13,000 more than she would have earned in her former position with the District Attorney's office. In 1993, the plaintiff commenced employment as a paralegal with the United States Customs Service, at a salary of $29,602.08. In 1993, she repaid unemployment insurance in the sum of $1200. In 1994, her wages with the U.S. Customs Service was the sum of $10,718.40 since she was out of work for ten months because of medical reasons. In 1995, she returned to work, and her wages to May 13, 1995, was the sum of $13,800. Her annual salary as a paralegal with the U.S. Customs Service is $38,273.

As to the alleged acts of gender discrimination, in general terms the plaintiff complained that (1) female probationary investigators who failed the civil service tests were discharged, while male probationers at higher investigative titles, who failed the tests, were given other jobs (see Tr. 53–64); (2) as to job assignments, the male investigators were assigned to surveillances, some hazardous in nature, which involved overtime pay but the women were not given those assignments; (3) in a reverse discrimination setting, when women investigators were used, it was in "sting" operations, such as driving cars to the target repair shops, while men were never used in those operations, which, according to the plaintiff, illustrated "a feeling that the supervisors in the District Attorney's Office would have, that the suspect would take advantage of a woman rather than a man" (Tr. At 67); (4) it was easier for men to get promotions than it was for women; and (5) male investigators were treated more advantageously than female investigators.

In particular, when the plaintiff was questioned about her claim that male investigators were treated differently than female investigators along the career path, she stated that a male investigator, Gregory Macauley, was given preferential treatment, in that he was hired at a higher grade than she was. However, the plaintiff conceded that Macauley had better qualifications:

THE COURT: Did he have better qualifications than you?

THE WITNESS: Probably, because the qualifications were higher than a—for an Assistant Detective Investigator than they were for an aide.

THE COURT: If he had higher qualifications than you why do you say you were treated differently?

THE WITNESS: I am not saying I was treated differently. I am showing different patterns for men than for women.

THE COURT: In what way did he have better qualifications than you did?

THE WITNESS: Prior to being employed in Nassau County, he was at some time a police officer, a police officer in Lansing, Michigan, Police Department. (Tr. at 198).

The plaintiff's contention that Gregory Macauley was given a preference in job promotions that was denied to her, is without merit. The record belies this assertion. Macauley was far more experienced in investigatory work than the plaintiff since he was employed as a police officer in Michigan for approximately eight years and also formerly worked for the Pinkerton Company. In fact, permeating this trial was evidence that the male investigators were promoted to higher investigative positions because they had more experience and prior police work. While on an overall philosophical observation, this could be viewed either as part of a longstanding gender discrimination in the law enforcement field, or as evidence of late entry into the field by females, it certainly is not proof of gender discrimination by the District Attorney of Nassau County.

One of the main contentions of the plaintiff, as to gender discrimination, was the failure to promote women in the investigative positions. The plaintiff testified that men were given the opportunity to quickly advance from Detective Investigator to Special

384

Investigator, and women were not given that opportunity. In this regard, she points to herself and Karen Lutz, who were never promoted to Detective Investigator or Special Investigator, and Pamela Luhrs, who was provisionally promoted to Special Investigator only after being in the office for ten years and after "many arguments" with the Chief Investigator. The plaintiff also asserted that she should have been given the opportunity to be appointed to full Detective Investigator rather than Assistant Detective Investigator II.

The employment record of Karen Lutz reveals that she started as a provisional Assistant Detective Investigator; took the test, passed and was appointed a Detective Investigator; and, in 1995 was provisionally appointed as a Special Investigator. Lutz is still with the Office of the District Attorney. Pamela Luhrs began employment in the District Attorney's Office as a paralegal; was then provisionally appointed as a Detective Investigator; passed the test for Special Investigator and was promoted to Special Investigator II, a position she presently holds.

In January 1992, there were three females on the investigative staff of the District Attorney, the plaintiff, Pamela Luhrs and Karen Lutz. In January 1992, the titles of Assistant Detective Aide, Assistant Detective I and Assistant Detective II were all abolished. After the plaintiff's termination in January 1992, there were no persons in those three titles and they were no longer used. After the plaintiff was terminated in January 1992, there were still two women working at the Office of the District Attorney in investigative titles, Karen Lutz as a Detective Investigator and Pamela Luhrs as a Special Investigator. The Court notes that neither Lutz nor Luhrs ever requested an assignment to a task force.

One of the plaintiff's major claims of gender discrimination was that women who failed examinations or were not reachable, were terminated while men in similar situations were given another position. The plaintiff named four such women, Moira Deiran, Aurea Feliciano, Carol Yevoli and Diana Cirruso. However, further inquiry on cross-examination revealed that all of these women were terminated in 1984, the same year the plaintiff was appointed. All four had left the office by the time the plaintiff was appointed. Further, the plaintiff passed the same test that all four other women had failed. Significantly, after the four females noted above failed the test and were discharged, they were replaced by three other women:

Q Isn't it true that these individuals had to be let go because they failed the test and they had to make room for you to be appointed?

A I don't know that.

Q Well, at least three of these women you identified as having been Aides; is that correct?

A That's correct.

Q And when you were appointed you were appointed as an Aide; is that correct?

A Yes.

Q And who else:

A Leslie Meyer, Meyer or Meyers, I don't recall. And Rachel Braver, B–R–A–V–E–R.

Q So Diane Calabritto—strike that.

Diane Calabritto, Leslie Meyers and Rachel Braver, three females were appointed to the position of Aide at or about the same time that three other females, Moira Duran, Aurea Feliciano and Carol Yevoli were let go as Aides?

A That's correct.

Q And you don't know the job title of the fourth female let go; is that correct?

A No, I don't. (Tr. At 277, 278).

It was further established that the three women who failed the test for Aide, would not have been qualified for any other investigative position, and, therefore, had to be discharged. The men who failed tests were in higher investigator positions and were able to drop back in rank.

Q ... Isn't it a fact that the men about whom you testified failed tests for something other than Aide?

A Yes.

Q And had qualifications to be appointed under Civil Service law to some other position in the District Attorney's Office?

A I guess if the position existed, I don't—of course, doors open up all the time. You can fail a test and you can be appointed to another position. (Tr. at 279–280).

Moreover, as set forth above, three of the four women were replaced by other women. In the Court's view this situation did not constitute gender discrimination.

The Court notes that in January 1992, in the shadow of the looming budget crisis, three investigators were laid off, two men and one woman, the plaintiff. Of all the District Attorney employees terminated during that period, two were rehired, one man and one woman. Again, in that circumstance the Court finds no evidence of gender discrimination.

In addition, there was evidence adduced that the plaintiff was given assistance and advantages while employed by the District Attorney. Executive Assistant District Attorney McCloskey went out of his way to assist the plaintiff vocationally. Based on his request, the Civil Service examination for Assistant Detective Investigator I was changed from an open competitive to a promotional examination, to assist the plaintiff. In addition, the District Attorney's Office waived the usual probationary period in the plaintiff's case with regard to her promotion to Assistant Detective Investigation I. (See Plaintiff's Exh. 1H).

Another instance in which the hierarchy in the District Attorney's Office went out of their way to help the plaintiff occurred in May 1988. At that time, the office requested that she be allowed to take an examination even though she lacked the required number of months in the title, as shown in the memorandum to the Civil Service Commission, dated May 9, 1988:

Subject: Diane Calabritto—Assistant Detective Investigator II

It is our understanding that the above named employee is the only one in the proper title to take this promotional examination. However, she does not have the required number of months in that title. We are therefore asking that you allow her the take the examination with the understanding that she will not be placed on the list until after she has been in title 6 months.

Thank you for your cooperation. (Plaintiff's Exh. 1E).

During her tenure with the District Attorney, the plaintiff was primarily involved in financial investigations. This is important because, since the plaintiff's layoff in 1992, the District Attorney has hired only financial investigators, three in number. Further, the plaintiff concedes that she does not know if any females applied for the position of financial investigator.

The Court was impressed with the gender fairness of the hiring practices in the Office of the District Attorney of Nassau County. Since 1992, the District Attorney hired sixty Assistant District Attorneys, thirty male and thirty female. Despite the objections of counsel for the plaintiff, in a gender discrimination case, evidence of such a gender neutral hiring record, is admissible as circumstantial evidence on the question of discriminatory intent. See, for example, *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir.1994); *Kelber v. Joint Industry Board of Electrical Industry*, 27 F.3d 42, 47 (2d Cir. 1994).

The plaintiff's gender discrimination case was supported by the testimony of Karen Lutz, who has been employed by the District Attorney for fifteen years. Lutz had no prior investigative experience. She was first employed on January 30, 1981 as an undercover investigator and in two months was provisionally appointed to the position of Assistant Detective Investigator Aide. In 1985, she was appointed as a Detective Investigator, and in May 1995 was provisionally appointed as a Special Investigator I.

Lutz testified that Gregory Macauley was promoted to provisional Detective Investigator before she was. Lutz questioned this promotion priority to the Deputy Chief Investigator, the Chief Investigator and Leff, but got no "satisfactory answer." Of course,

as stated above, there is evidence in the record that Macauley was formerly employed as a police officer in Michigan for eight years and also worked for the Pinkerton Company, while Lutz had no prior experience as a criminal investigator.

The following exchange occurred on this subject:

Q But you did not have any law enforcement investigation experience?

A Right.

Q Is that correct?

A Yes.

Q Are you aware of whether other members of the District Attorney's investigative staff had law enforcement experience prior to joining the District Attorney's staff?

A Some have and some haven't.

Q But in some cases such experience does exist?

A Yes.

Q For example, you indicated that a Mr. Greg Mccauley (sic) became an Assistant Detective Investigator at or about the same time as yourself; is that correct?

A Yes.

Q And Mr. Macauley received a provisional appointment to the title of Detective Investigator before you did?

A Right.

Q And Detective Investigator is a higher grade than Assistant Detective Investigator I?

A Yes.

Q And so, you started at or about the same time, at the same level, but he advanced more rapidly?

A Yes.

Q Do you know whether Mr. Macauley had any law enforcement experience prior to joining the District Attorney's Office?

A Yes, he did.

Q Thank you. (Tr. at 493–94).

In addition, Lutz testified that she noticed differences in the treatment of male and female investigators. She complains of an "attitude." Asked to be more specific, Lutz described a situation where there was a threat against an Assistant District Attorney and his family, and investigators were required to guard the Assistant District Attorney. The two female investigators were the only ones excluded from the list. At first the Chief Investigator said, "you know, we were the women," and then he said it was an oversight and he would correct it with a new roster. There was no new roster but the whole project was abandoned after a day or two, following complaints by the two female investigators. Questioned by the Court as to who made the statement, "you know, we were the women," Lutz, who at first said it was the Chief Investigator, and then said, she thought it was the Deputy Chief "ten years ago." The colloquy is as follows:

THE COURT: Before you get to overtime, you said that—that somebody said with regard to this protection for an Assistant District Attorney, that you say that the two females were not put on the roster of protecting investigators; is that correct?

THE WITNESS: Protecting the ADA and his family.

THE COURT: And you said somebody said, I think you said Chief, I am not sure, that we were the women? Is that what you said? We were the women? Did somebody say that?

THE WITNESS: I can't remember the exact quote. But it was why were we complaining? We shouldn't even want this assignment, I guess, or something like that because, you know, we were the women.

When we went to the Chief it was, well, we had to really explain why this was in our minds discrimination. I mean we were detectives. We should be—if you are going to assign the whole office to do this we should be assigned this also. If we are not capable we shouldn't be there.

THE COURT: You said—who said we were the women? You said you went to the Chief when this was said. Who said that to you?

THE WITNESS: I believe it was the Deputy Chief.

THE COURT: Who was that?

THE WITNESS: Who was the Deputy Chief at that time? I would have to go back and look at the time frame.

THE COURT: When was this?

THE WITNESS: This must have been ten years ago.

Again, I don't want to swear to what time it was, because I would want to check that out.

Q You recall the incident?

A Yes, I do recall the incident.

THE COURT: Approximately when was that? Ten years ago you say?

THE WITNESS: I would say approximately ten years ago. (Tr. at 483–84).

Also, according to Lutz, on surveillances on a case not assigned to a female, only the male investigators were called upon. She made reference to one case, which was a Suffolk surveillance near her home, yet four male investigators were assigned, including two male investigators with no prior police experience and less years in the office than Lutz. According to Lutz, Chief Investigator Dietz said "let the females do this because they are good at paperwork." On cross-examination, Lutz conceded that the remark was that "Pat and Karen are good with paperwork," not that "females" are good at paperwork. The distinction between the two terms is meaningful. However, the Court notes that the very first assignment Lutz received was in an undercover capacity, wearing a wire. In addition, in her first year she was assigned to a complex investigation using audio surveillance techniques, with no prior police experience. These occurrences, in which women were excluded for surveillances, indicating that females should not take an equal part in dangerous assignments, may be viewed as gender discrimination. However, Lutz also testified that, during her fourteen years as an investigator with the District Attorney, she did the same kind of investigations as the other staff investigators.

Further, Lutz testified that "there was a time when there was a big discrepancy between the overtime for male investigators and the female investigators," in that "the male investigators were getting the overtime and the females weren't." This occurred about four years ago, "around 1991." Lutz testified that she complained about this practice to Chief Investigator Dunn, to Assistant District Attorney Steve Irace and to her union representative. Her union representative was Diane Calabritto. Interestingly, Calabritto denied that any such conversation took place. However, in regard to overtime, the Court notes that the plaintiff received overtime payments of approximately $8,000 per year as a member of the Task Force.

Lutz testified that, since 1992, the District Attorney hired only four male investigators, including three financial investigators and one environmental investigator. At the present time Karen Lutz and Pamela Luhrs are the only female investigators on the staff. However, there is also a female investigative accountant, a Ms. Gurien, on the staff, who performs a different kind of investigative function.

As the Chief Assistant District Attorney, Laurence Leff is the number two person in the Office of the District Attorney of Nassau County. He is responsible for supervising the investigative staff in the office. Leff and other witnesses were questioned about a statement Leff made in his deposition. At that time, he was asked about the budget lay-offs in January 1992 and testified, in part, as follows:

Answer: It was paramount that we be able to continue to carry out the missions and responsibilities of the District Attorney's Office, and if we had made what we believe to be a *reasonable symbolic commitment* to reducing our personnel, we were not going to go beyond that and dismember the office. That was the position and the decision of the District Attorney, which I fully supported. (Emphasis supplied) (Tr. at 520).

Leff further explained that the office was determined not to diminish its mission, which is to prosecute and try criminals. It was determined that, because of the reduction in their budget, causing an "enormous revenue shortfall" and because "some homage would have to be paid to the County's demands," they would eliminate the most junior titles. Among the most junior titles in the office were Assistant Detective Investigator I and

Assistant Detective Investigator II, who had no prior law enforcement experience.

The Court finds that the proposed 1992 budget reduction did necessitate reductions in the number of employees in the Office. The Court further finds that the mission of the District Attorney of Nassau County is to prosecute criminal cases in which arrests have already been made by police units. Investigations in most of those cases is done by the Nassau County Police Department. In furtherance of the District Attorney's mission, the Court finds that it was reasonable and justifiable to terminate the most junior investigators in The Office. That task was accomplished by laying off all the Assistant Detective Investigators, regardless of gender. As Leff stated:

Q And in the scheme of priorities could you place for the Court the level of priority assigned to participating with the federal government in the Customs Task Force? A In the scheme of things in my opinion it was a moderate in importance function in the District Attorney's Office.

Since the District Attorney's Office is basically a large law firm, investigative matters in general are supportive of the law firm, but they tend to be the tail of the dog, not the head and the body. And investigations for the federal agencies have a place in the District Attorney's order of priorities. However, we are not a police force. We have at this time few than 20, I believe, or just over 20 investigators. We never had, to my knowledge, more than 30 or so investigators. We can't compete with the 3,000 man Nassau County Police Department, not should we be competing. They have a separate role to play, which is policing the County. The federal agencies have an investigative responsibility for policing interstate commerce, and they tend because of their tentacles in other jurisdictions, to come up with major cases that do not an impact on us, we here in the local scene. So that I probably used a great many words to say that it is not the highest priority. It is certainly not the lowest priority. (Tr. at 564–65).

Leff explained that in late 1991, faced with a budget crisis, he "established the catego-

ries of title that would be expendable and permit us to continue to carry out our responsibilities. It was only after those categories were established that the people's incomes became the focus of our attentions." Leff stated that he made the recommendation that Diane Calabritto and the other investigators should be terminated. In January 1992, the office abandoned the titles of Assistant Detective Investigator and Detective Investigator, and has hired no such persons since that time. The only investigators employed since 1992 have been financial investigators and one environmental investigator. Financial investigators are used to investigate "complex white-collar crimes where a great deal of focus is on books and records, and intercorporate affairs with bank accounts being significant."

Leff was questioned about waiving the probationary terms for all of the male investigators in the office. He responded that a probationary term for Diane Calabritto was also waived. Further, Leff testified that, wherever the Civil Service regulations permit a waiver of a probationary period, he has done so.

Q Sir, isn't it in fact true that the employing body, that is, the Nassau County District Attorney's Office, has a right to check off on the Civil Service form, probationary term waived, instead of probationary term 60 days?

A Only under the circumstances that the Civil Service Commission permits. And under one or the other circumstances, Civil Service requires that probation be imposed. We have no discretion in the matter.

Q And, sir, can you tell me what that Civil Service requirement is that you were referring to?

A As I understand it, in either a promotional or in a—whatever the other category is, one of them permits discretionary waiver of probation.

To the best of my knowledge throughout the years, anyone already on staff where Civil Service permitted us to, I signed off on waiver. (Tr. at 542–43).

Leff also explained that he tried to keep all the investigators who failed civil service tests, both the male Special Investigators and the female Assistant Detective Investigator Aides. In all instances he called Adele Leonard, the Executive Director of the County Civil Service Commission, for assistance. In the case of the more experienced investigators, he could find other positions for them. However, for the junior inexperienced investigators, there were no other positions available for which those persons could qualify. In sum, the Court credits the testimony of Leff when he stated that the elimination of the Assistant Detective Investigator series had nothing to do with gender:

> Q What was your primary concern in selecting the Assistant Detective Investigator series for elimination at that time?
>
> A My primary concern was to be able to continue to run the investigative arm of the District Attorney's Office in a meaningful way, in an effective way. (Tr. at 578).

Leff further testified that during the years 1984 to 1990 there were no female applicants for the positions of Special Investigator or Financial Investigator, probably because of the work experience requirements of ten years prior detective and organized crime work.

Gregory Macauley commenced employment with the District Attorney in March, 1984, as an Assistant Detective Investigator I. He passed both the Aide and the Assistant Detective Investigator I tests. In March 1986 he was provisionally appointed to Detective Investigator. At that time Karen Lutz had more seniority than he did. In addition, even though he was in a higher grade, Macauley was assigned to cases in which Karen Lutz supervised him. At the present time Macauley is a Special Investigator II.

However, Macauley had extensive prior experience in criminal investigation. He was employed as a police officer in the Lansing, Michigan Police Department for eight years. In that position he did plainclothes detective work, crime analyses, detention work and uniform patrol assignments. Then he was employed by the Pinkerton Company for two years. During that assignment, he was the Chief Investigator for the Pinkerton Long Island Bureau. He handled insurance claims investigations, employee background checks, internal theft, and narcotics use investigations at the Pinkerton Company. When Macauley entered the service of the District Attorney as an investigator, he had ten solid years of law enforcement investigatory-related experience. Yet, with all this criminal investigation experience, Macauley was asked to and did accept employment with The Office as a Detective Investigator I. In this Court's view, based on his extensive criminal investigation experience, this male was not propelled forward too rapidly by the District Attorney. When he was promoted over Karen Lutz, Macauley had many more years of active criminal investigative work. This Court finds that the speedier promotion of Macauley over Lutz, was reasonable and was rationally based.

Further, significantly, the Court notes that Macauley applied to be appointed to both federal task forces. With all the prior law enforcement and investigatory experience and his senior position, Diane Calabritto was selected over him for appointment to the Task Force, and to receive the accompanying overtime compensation.

Macauley also made certain observations with the way male and female investigators were treated. First, he stated that female investigators were not given certain assignments. In this regard, he referred to the 1986 protection detail for the threatened Assistant District Attorney, in which the protection detail was made up of only male investigators, even though the original arrest on the case was made by Karen Lutz. Also, in 1988 there was another protection detail for a witness in a narcotics case. The witness protection detail in that matter was also made up only of male investigators. However, Macauley conceded that sometimes it would be appropriate to assign some complex cases to more experienced investigators, and to assign simple cases to junior investigators.

Also, Macauley testified that "there was a paternalistic attitude displayed by the former Chief (Jack Cuddy) and former Deputy Chief Investigators (Jack Fiedler and John Mur-

phy) toward females." While plaintiff's counsel was content to let the matter rest with this statement, the Court asked Macauley to define what he meant by "a paternalistic attitude."

THE COURT: Are you leaving that at this point, that point?

MR. STOBER: Yes. Unless you have some questions.

THE COURT: What is a paternalistic attitude? I don't know what that means. What is that?

THE WITNESS: They seem to display greater care and concern in dealing with female investigators when it came to assignments that were either hazardous or physically demanding.

THE COURT: Care and concern? You call that paternalistic? Care and concern? I don't understand that.

THE WITNESS: They didn't seem to display that same level of care and concern for those hazardous assignments and physically demanding assignments when they were given out to male investigators.

THE COURT: So it is your view that male and female investigators should be treated equally with respect to assignments?

THE WITNESS: Absolutely.

THE COURT: And is it your impression that it was the female investigator's view also?

THE WITNESS: Yes.

THE COURT: And they wanted to be treated equally no matter what the hazardous assignments would be?

THE WITNESS: Yes.

THE COURT: And when you say paternalistic, you meant that for whatever reason, the Chief Investigators wanted to protect the women more than the men?

THE WITNESS: That is correct, that characterization, yes, sir.

THE COURT: All right. (Tr. at 612–16).

Macauley tried to relate the lack of experience generated by this "paternalistic-attitude" to missed valuable job experience and promotions. It is understandable that female investigators would want to share equally in job assignments, even though some are more dangerous than others. Denying women the opportunity to be involved in dangerous investigation assignments could, under certain circumstances, constitute gender discrimination. Especially relevant, in this regard, would be a diminution in promotion opportunities or financial gain as a result of not being able to participate in "dangerous" assignments. However, in this case, the Court finds that there is no proof that this generalized paternalistic attitude resulted in the lack of any valuable experience, promotion-wise, or to anyone's financial detriment. The first incident related by Macauley took place in 1986 and, the investigation lasted only one or two days. The second incident took place in 1988 with unclear circumstances. The Court finds that there is no evidence that these two incidents or the so-called generalized paternalistic attitude constituted a pattern of gender discrimination that contributed in any manner to the plaintiff's termination in 1992. In fact, Macauley described another incident in which a hazardous arrest was made by Karen Lutz. Rather, the Court finds that the plaintiff was laid off, among thirteen other employees, seven male and seven female, solely because of the 1992 budget crisis.

### III. *Dispositive Additional Findings*

#### A. *This is a McDonnell Douglas–Burdine–Hicks Pretext Case*

 The Court finds that the plaintiff failed to produce evidence to establish that her gender played a motivating or substantial role in her termination on January 24, 1992. The plaintiff failed to adduce evidence that could reasonably allow the court, as a fact-finder, to conclude that Diane Calabritto's termination was "because of" her gender. Further, the plaintiff produced no circumstantial evidence of discrimination directly related to her termination. Nor did the plaintiff adduce any policy documents or statements by persons in the decisionmaking process reflecting gender animus.

Therefore, the Court finds that the plaintiff is not entitled to a the shifting burden advantages of the "mixed motive" discrimina-

tion cases. The Court will address the plaintiff's claim in the context of the *McDonnell Douglas–Burdine–Hicks* pretext cause of action.

## B. *The Prima Facie Case*

The Court finds that the plaintiff Diane Calabritto proved the first three elements of a *prima facie* case, by a preponderance of the evidence, namely:

1. The plaintiff is a member of a protected class;

2. The plaintiff was qualified for the position of Assistant Detective II, the position she held at the time of her termination; and

3. The plaintiff was terminated from her position on January 24, 1992.

The fourth element that the plaintiff must prove is that her termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's gender. This issue presents a close question. Three Assistant Detective Investigators were terminated, two males and one female. That material circumstance would not lead to an inference of discrimination. However, the burden of proof that must be met with regard to such an inference, at the *prima facie* stage is *de minimis*. *See e.g., Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Dister v. Continental Group Inc.*, 859 F.2d 1108, 1114 (2d. Cir.1988). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

In addition, the proof reveals that only male investigators were hired after January 1992; that, generally, all of the investigators perform the same duties; and every female investigator who has failed a Civil Service test was discharged, while every such male investigator was retained in another position. Accordingly, the Court finds that the plaintiff Diane Calabritto has established, by a preponderance of the credible evidence, the four elements of her *prima facie* case of gender discrimination.

## C. *The Non–Discriminatory Reason Advanced*

The Court finds that the District Attorney of Nassau County has advanced a "legitimate non-discriminatory reason" for its decision to terminate the plaintiff's employment on January 24, 1992. The reason is that, in 1991, the District Attorney was advised by the County Executive of Nassau County and the Board of Supervisors of Nassau County that its proposed 1992 budget would be reduced by a sum of approximately four million dollars. In order to conform to this severe budgetary constraint, the District Attorney was compelled to reduce expenses. Because salaries make up approximately 90% of its operating costs, the decision was made to terminate employees. Among the fourteen employees to be terminated were the most junior investigators. The District Attorney properly determined not to impair its primary mission, to prosecute criminal cases.

The decision by the District Attorney to terminate his junior investigators was a reasonable business judgment, in that they were the non-vital positions least valuable to the defendant. That these lay-offs were caused by the impending budget crisis, is undisputed. Therefore, the defendant has articulated and proved a legitimate, non-discriminatory reason for terminating the plaintiff on January 24, 1992. That additional monies were later allocated to The Office, does not, in any way, obviate the reasonable business judgments made in the face of this fiscal crisis.

## D. *Was the Stated Reason a Pretext?*

The Court finds that the 1992 budget crisis was, in fact, the only reason for the employment decisions of the District Attorney to discharge fourteen employees in January 1992. Reviewing the evidence and the prior findings in this case, the Court finds that the January 1992 termination decisions were not, in any way, based on gender discrimination. Having said that, the Court does find some evidence of gender discrimination by the Office of the District Attorney. The "paternalistic" attitude of the Chief Investigator and the Deputy Chief Investigator, in "sparing" the female investigators from hazardous investigations and protective

assignments did constitute a form of gender discrimination. The female investigators, if qualified and willing—and these female investigators were qualified and willing—had an absolute right to be assigned to hazardous duty. Not only was this a necessary component of their chosen occupation, but it could serve as a method of employment advancement and increased financial remuneration. However, the Court further finds that there is no evidence that the "top four" policy makers, District Attorney Dillon, Chief Assistant District Attorney Leff, Executive Assistant District Attorney McCloskey and Assistant District Attorney Levinson even knew about these discriminatory acts, much less condoned or approved them. In addition, the last act of this "paternalistic" treatment occurred in 1988, four years prior to the employment decisions at issue. Therefore, such discriminatory acts could not be a cause of the termination of the plaintiff. Nor could such practices, limited to two investigations in 1986 and 1988, constitute a pattern or practice that motivated any employment decision in 1991 or 1992.

The other alleged incidents pointed out by the plaintiff and the other witnesses, do not constitute evidence of gender discrimination. The more rapid promotion of experienced police criminal investigators was merit based and proper; the differences in the procedures to obtain overtime payments between the plaintiff and Martinez were trivial and were satisfactorily explained by the varying methods of payment between the United States Customs Task Force and the United States DEA Task Force; the abolition of the position of Assistant Detective Investigator and Detective Investigator was non-gender based and was a non-discriminatory business decision by the District Attorney; the post–1992 hiring of four male investigators, who each had in excess of ten years of law enforcement experience and were qualified as financial investigators, was not based on gender discrimination—the Court is reasonably convinced that a qualified woman would have been hired; men who failed Civil Service examinations were retained because they had higher positions to begin with, had greater qualifications and could be placed in another position; the women who failed Civil Service examinations, were in the most junior positions and could not be placed in another position; Macauley advanced faster than Lutz because of his extensive high level criminal, law enforcement and investigatory experience, not because he was a male; the only investigator ever discharged for cause was a male; and when, in January 1992, the time of reckoning approached, the junior investigators, two males and one female, the plaintiff, were terminated.

## CONCLUSIONS

The plaintiff Diane Calabritto established a *prima facie* case in that giving the plaintiff every benefit and every favorable inference, in a burden that is *de minimis* and not onerous, her termination occurred in circumstances giving rise to an inference that it was based on her gender.

The defendant District Attorney of Nassau County advanced a legitimate non-discriminatory reason for the termination of the plaintiff on January 24, 1992, namely that the severe budget constraints required terminating the most junior investigators in The Office.

The plaintiff failed to prove that the defendant's stated reason for her discharge was a pretext for gender discrimination.

The plaintiff failed to prove that her discharge on January 24, 1992 was in any way motivated by gender discrimination on the part of the Office of the District Attorney.

Accordingly, for the reasons stated, the Court directs the entering of a judgement in favor of the defendant Nassau County District Attorney Denis Dillon dismissing the complaint.

SO ORDERED.